(876 P.2d 193)
No. 69,693
No. 70,053

WARREN BROWN GILLESPIE and POLLY GILLESPIE TOWNSEND, *Plaintiffs/Appellees*, v. DOROTHEA WOFFORD SEYMOUR, *et al.*, *Defendants*, and ROBERT W. BURDGE, an accountant; and GRANT THORNTON, an accounting partnership, *Defendants/Appellants*.

JAMES PAUL GILLESPIE, Executor of the Estate of Pauline Brown Gillespie, deceased, *Plaintiff/Appellee*, v. DOROTHEA WOFFORD SEYMOUR, *et al.*, *Defendants*, and ROBERT W. BURDGE, an accountant; and GRANT THORNTON, an accounting partnership, *Defendants/Appellants*.

Petition for review denied 255 Kan. 1001 (1994).

Opinion filed June 17, 1994.

*Ron Campbell*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, and *Stanley J. Parzen* and *James C. Shroeder*, of Mayer, Brown & Platt, of Chicago, Illinois, for the appellants.

*Jerry D. Bogle* and *Glenn D. Young, Jr.*, of Young, Bogle, McCausland, Wells & Clark, P.A., of Wichita, for the appellees.

Before ROYSE, P.J., LEWIS and PIERRON, JJ.

PIERRON, J.: This is the fourth appeal arising out of allegations of mishandling of one of two trusts established in 1956 by Warren Brown for the benefit of his children and other descendants. The three earlier appeals were *Gillespie v. Seymour*, 253 Kan. 169, 853 P.2d 692 (1993) *(Gillespie II); Gillespie v. Seymour*, 250 Kan.

123, 823 P.2d 782 (1991) *(Gillespie I)*; and *Gillespie v. Seymour*, 14 Kan. App. 2d 563, 796 P.2d 1060 (1990).

These previous appeals dealt with the adjudication of the liability of various family members and their corporations. The instant appeal involves the alleged responsibility of Robert W. Burdge, an accountant, and Grant Thornton, an accounting partnership. The plaintiffs are the children of Pauline Gillespie who were the beneficiaries of the estate of Pauline Gillespie, and the estate itself. A review of the pertinent facts necessary for the determination of this appeal requires a comfortable chair and a long attention span. We will try not to include facts that, although interesting, are not necessary in the deciding of the case. The previous appeals provided us with, in Justice McFarland's apt characterization, just the framework of the background giving rise to this appeal.

In *Gillespie I* we learned the following:

"Warren Brown was a wealthy Wichita businessman. In 1956, Mr. Brown created two revocable inter vivos trusts. His two children, Dorothy Brown Wofford and Pauline Brown Gillespie, were the co-trustees of each trust. In the trust instruments, the trustees were vested with full legal and equitable title to the trust property . . . . Broad powers were granted to the trustees as to the investment of trust property . . . .

"The two trusts held substantially equal assets of stocks, bonds, and bank stock. Warren Brown died shortly after the creation of the trusts. . . .

"Each of the co-trustee daughters was in her 60's when the trusts were created. One of the trusts was for the benefit of Wofford and her four children (Wofford Trust), and the other was for the benefit of Gillespie and her two children (Gillespie Trust). With the approval of Wofford (or her successor trustee), Gillespie could withdraw any or all income as well as the corpus of the Gillespie Trust. Wofford had like rights in the Wofford Trust. After the death of Warren Brown, Gillespie was the dominate figure in the investment of trust assets held by each trust.

"In 1973, Wofford died and the Wofford Trust terminated, with the trust assets being distributed among Wofford's four children. At that time, each trust had a value of approximately $3,000,000. Pursuant to the terms of the Gillespie Trust, Dorothea Wofford Seymour (Wofford's daughter) succeeded as co-trustee of the Gillespie Trust.

". . . Gillespie had been making personal investments in oil and gas interests dating at least from the early 1950's. In the late 1950's Dorothea Wofford Seymour (Dorothea) and her husband, Paul Seymour, Jr. (Seymour), created a corporation, Arrowhead Petroleum, Inc. (Arrowhead). Dorothea owned 49 percent of the stock and Seymour owned the remaining 51 percent. Seymour managed the company. Shortly after the creation of Arrowhead,

Gillespie commenced making her personal oil and gas investments exclusively with Arrowhead. Gillespie was concerned over the amount of income tax each trust was paying on its investment profits. In 1965, each trust's tax liability was over $67,000. Gillespie kept the records on each trust with the assistance of accountants and made the final decision on investments for the trust, although approval therefor was required by her co-trustee (Wofford and, later, Dorothea). The co-trustee deferred to Gillespie's judgment in these matters.

"In 1965, to reduce income tax liability, each trust began investing in oil and gas interests. All such investments were through Arrowhead. The investments of each trust with Arrowhead were $34,626.29 in 1965. Dorothea did not participate in the management of Arrowhead. Oil and gas investments were made on the basis of discussions and negotiations between Gillespie and Seymour with some involvement by certain accountants. . . . All trust checks required the signature of both trustees. Between 1965 and 1973, each trust paid Arrowhead exactly the same amounts on the same dates and received the same interests in the same leases. In 1968, Gillespie determined that in order to achieve maximum tax benefits from the oil and gas investments for the two trusts, it would be best to make block investments with Arrowhead of amounts determined early in each calendar year. All block investments were from trust income. An attorney and an accountant were consulted who saw no problem with this procedure. Under the block investment program, any excess remaining at the end of the year was to be applied to wells drilled rather than returned to its respective trust.

"As previously stated, Wofford died in 1973 and Dorothea succeeded her at that time as co-trustee of the Gillespie Trust (hereafter, Trust). . . . The continuing Trust made block investments with Arrowhead between 1974 and 1987 of yearly amounts ranging from $110,000 to $300,000.

"In the winter of 1987, the plaintiffs herein, Warren Brown Gillespie and Polly Gillespie Townsend (children of Gillespie) brought an action against Dorothea as co-trustee seeking an accounting of the Trust's investments with Arrowhead. On February 2, 1988, Gillespie died at age 92. At the time of her death, the Gillespie Trust contained assets in excess of $11,000,000. On June 27, 1988, the petition was amended, seeking compensatory and punitive damages from Dorothea, individually and as co-trustee, Seymour, Paul Seymour, III, Arrowhead, Big Springs Drilling, Inc. (Big Springs Drilling), Ruth Bassett, Robert W. Burdge, and Grant-Thornton (an accounting partnership) arising from alleged mismanagement of Trust funds invested in Arrowhead.

"The trial court dismissed the claims against defendants Burdge and Grant-Thornton and certified the judgment to be final pursuant to K.S.A. 1990 Supp. 60-254(b). The plaintiffs appealed therefrom. The Court of Appeals affirmed in part, reversed in part, and remanded the case for further proceedings. Specifically, the Court of Appeals held that a cause of action had been stated for breach of trust against the accountants for conspiracy to

overcharge the trust account and participation in overcharging the account.' *Gillespie v. Seymour*, 14 Kan. App. 2d 563, 472, 796 P.2d 1060 (1990). . . .

"The trial court . . . held that by virtue of assorted wrong-doings by the defendants, the Trust had been damaged in the amount of $2,476,422. To this, the trial court added tax allowances of $843,607 for a total judgment of $3,320,029 through December 31, 1987. Between said date and the date of judgment (December 14, 1990) interest was allowed on the judgment in amounts ranging from 9.5 percent to 11 percent. The aggregate judgment was in excess of $4,000,000. Dorothea, Seymour, and Arrowhead were held to be jointly and severally liable on the entire amount. Paul Seymour, III, was held jointly and severally liable for 87.92 percent of the total damages.

"Additionally, punitive damages for the period prior to July 1, 1987, were assessed as follows:

| | |
|---|---|
| Dorothea: | $ 2,000,000 |
| Seymour: | $ 2,000,000 |
| Paul Seymour, III: | $ 25,000 |

For the period after July 1, 1987, punitive damages were awarded as follows: Dorothea and Seymour,

| | |
|---|---|
| jointly and severally: | $ 89,250 |

"Additionally, there were some allowances involving some billings among Gillespie's estate, Big Springs Drilling, and Arrowhead which are comparatively small in amount and are not at issue herein." *Gillespie I*, 250 Kan. at 125-28.

In the decision in *Gillespie I*, of particular importance was the ruling by the court concerning Gillespie's rights in the trust.

"Gillespie was a co-trustee and a beneficiary of the Trust. She could have received income or all or part of the corpus of the Trust as a beneficiary, but she did not. Throughout the entire 31-year existence of the Trust, no Trust assets or income were transferred to her as a beneficiary. In all of her dealings with Trust assets, income, and investments, she was acting as a co-trustee." *Gillespie I*, 250 Kan. at 132.

Apparently, had Gillespie spent the money involved on fancy men, fine wines, and "high living," there would be no case. However, since the funds were disbursed through a trust, the motives of those involved are at issue.

The contribution of the Court of Appeals to the controlling case law to this point comes from the above-mentioned 1990 case. We affirmed the dismissal of the stated causes of action against the accountants/defendants for negligence, malpractice, breach of fiduciary duty, breach of contract, conversion and conspiracy, and fraud and conspiracy. However, we found that, "the allegations [of the petition], if taken as true for purposes of the motion to

dismiss, and drawing all inferences favorable to Beneficiaries, support a cause of action for breach of trust." 14 Kan. App. 2d at 563-64.

Due to a number of factors, this action against Burdge and Grant Thornton was not tried with the other actions.

Essentially, the accountants are charged with failure to tell Gillespie a spreading scheme (a tax-avoidance plan that involved spending excess trust funds at year's end on dry wells) was an extremely poor method for tax savings, in that it saved only about $1 for every $2 lost, and that this was done in connivance with "the Seymour group." Gillespie was allegedly duped.

The accountants are also accused of conspiring with Seymour to overcharge the trust account for dry holes, and spreading to dry holes after the funds had been allocated to other places. Essentially, the Gillespie Trust (Trust) always ended up with bad investments while other investors made money.

Burdge was a partner in the accounting firm of Elmer Fox & Company (Fox), which had provided accounting tax services for Warren Brown during his lifetime. Thereafter, it did accounting work for the Trust, Pauline individually, Arrowhead, and Big Springs Drilling, Inc. (Big Springs).

Grant Thornton came on the scene on May 1, 1985, when it assumed the ownership of a substantial portion of Fox's assets. Many of Fox's partners and employees went to work for Grant Thornton. The nature of the Grant Thornton buy-out of Fox will be discussed later. Burdge worked as a Grant Thornton partner until he retired from the firm on October 31, 1985. After Burdge left Grant Thornton, he went to work for Big Springs.

The trial court made over 40 pages of findings, all of which contributed to the understanding of the factual background necessary to decide the case. Rather than attempting to set these out verbatim we will summarize the most important ones dealing with the accountants' liability.

The district court found the accountants had an obligation to say "no" to Gillespie's spreading plan because they were, at the time, also doing work for parties involved in the oil drilling work that the Trust was helping financially, and which caused the Trust to suffer economic losses.

Burdge had worked for Paul Seymour, Jr., before working for the Trust and Gillespie. The spreading of money had been going on before Burdge started doing work for the Trust.

The trial court made some findings about Gillespie which are well supported by the record and bear on some of the central issues involved in this appeal:

"8. Gillespie invested some of her own funds in oil. After Dorothea and her husband, Paul Seymour, Jr. (Seymour), entered the oil business as Arrowhead Petroleum, Inc. (Arrowhead) in the Sixties, Gillespie made investments only with Seymour. Warren (Gillespie's son) knew Gillespie was making oil investments with Seymour. Warren did not think oil investments were advisable, but Gillespie did not consult with him about investments, did not ask his advice and ignored any volunteered advice.

. . . .

"115. Burdge did not tell Gillespie that she was wasting her money and Trust's money by spreading the money to Arrowhead at year end. Burdge did not tell Gillespie it was costing her and Trust $2 of expense to save $1 of tax. Burdge never told Gillespie that it was a net detriment for her and Trust to spread excess monies for the purpose of getting a tax deduction. Burdge testified he thought it was Gillespie's position 'that she would rather spend $100,000 to save $50,000 in tax than to set there and pay $50,000 in tax she didn't have to pay.' He never discouraged this idea, and he never told her it was a bad idea. He had the obligation to disclose and to discourage. If she did not take his advice, he had the duty to decline employment.

. . . .

"141. Certified Public Accountants must say 'no' to clients, especially in cases where they have both sides as clients. Trust and Gillespie were spending money for so-called oil and gas investments. According to defendant, these investments were to help out the family. As such, the payments were in direct violation of both the gift and income tax laws. As tax advice, the application of the block investment as practiced, not as contemplated, made a farce of any semblance of reasonable and necessary expenses. The application of funds was pouring money down a rat hole. Defendants characterize Pauline Gillespie as curt, dismissive (sic), non-social and non-gregarious (See Defendant' Requested findings of Fact 31). She lied to Warren and neither sought his counsel nor advice. Somebody needed to say 'no.' There was a Trust. No provision of the Trust authorized gifts to anyone under the guise of business expense. The Trust allowed payments to Pauline, but at what consequence. The consequences were death taxes at the highest rate. No one was going to advise Pauline to take any action where this would happen. Pauline did ask Burdge for advice on investments. I will find that the advice sought was generic. She did not ask for advice specifically about her grandson's company, but she did ask for general advice on buying industrial

revenue bonds. She did not ask for advice (nor did Burdge give) of the type, 'Should I buy Ford or General Motors?'

. . . .

"144. Burdge was being well paid for his work. He did not attempt to say what he did for his pay in preparing tax projections. The efforts of experts to say what was done did not answer the question of what Burdge did. He could have said 'No' to Pauline. What would she have done, we don't know, but had Burdge done so, the Court would not be met with the case.

"145. Pauline was a wealthy woman, and was wealthy before the income tax became a major factor against acquiring wealth. She knew the days when the names of income tax payers were posted for all to see in the post office. She hated paying taxes. But we all have to adjust to the power of the legislature or congress to pass laws. No one can decide to ignore the law. Taxes have increased. Business regulation has increased. Court procedure has changed. We are met with OSHA, EPA, UCC, UCCC, FERC, Restatement 402(b) and the list goes on seemingly forever as laws are made and changed on the State and Federal Levels. Judges are met with the judicial administrator. All increase paperwork, limit income for some, or give income in the way of jobs or recovery for others. Burdge would not and did not tell Pauline the consequences of her actions. Seemingly, to her, she was drilling up tax money. In actuality, she was deliberately losing money for herself and Trust. The Court specifically ordered that Burdge could prove his independence as an accountant. The Court finds he had sufficient clients to be independent. The court determines that he did not exercise that independence."

These findings are quite consistent with the general picture of Gillespie as a strong and opinionated person who apparently suffered neither fools nor opinions contrary to her own. These findings are totally inconsistent with the plaintiffs' theories of a bamboozled naif who was finagled out of huge amounts of money.

We must remember that there is no direct evidence of Gillespie having been fooled. She died before there was any contention in the litigation that she had been victimized over a long period of time. She certainly never gave any indication that this was her belief or that she disagreed with any of the results of her choices.

In 1973, she fired Standard and Poors, who had been the brokers for the Trust, because she did not believe it was doing a good enough job. We note that under her management, even with her highly questionable tax avoidance measures, she increased the Trust corpus from $3 million to $11 million from 1973-1988 with very careful investment decisions. However, her

knowledge of the oil business was admittedly limited, although she dabbled in it for many years.

The first issue we must resolve is the status of Grant Thornton in this litigation. The trial court found:

"150. I have been cited the case of *Fisher v. Hargrave*, ____ Ill. ____, 48 N.E.2d 966, (1943), for authority as to successor liability in partnership matters. The Court found, under Illinois law, there was no successor liability. There are many differences from the case before the Court. In *Fisher*, Partnership II only took such accounts as were satisfactory to it and where the client consented. Also, no employees were taken into Partnership II, no premises went to Partnership II. Partnership I still existed and offered to enter its appearance and submit its assets to any judgment plaintiff might obtain.

"151. Here all clients became clients of Grant without any disclosure of the difference in operations. (There were a selected few who were introduced to Grant's higher offices.) No clients were asked to consent to the transfer to Grant. Grant took employees and premises except where special arrangements were made. Here Grant hid the partnership agreement for years from the filing of suit, defended the entire liability and not just the limit period where Burdge was a partner. Someone made the election not to notify Fox' insurer (Fox is required under the agreement to cover Fox people for liability during the period Fox practiced accounting). Grant says it can be liable for acts for a five month period and Burdge is liable for the rest. Here Grant concealed the continued existence of Fox and objected to its being made a party.

"152. I find that Burdge was guilty of a breach of trust as required by *Gillespie v. Seymour*, 14 K.A.2d 563, 796 P.2d 1060, (1990), and that Grant is a responsible superior.

"153. Usually, the rule stated is: There cannot be a partnership by estoppel in a tort matter and that a partnership by estoppel exists only in contractual matters. That is the general rule. But here we have tort actions which arise because there were contracts between the parties. Therefore, Grant has successor liability. The various torts arise because of the contracts that existed."

We believe the court's ruling is contrary to the present law in Kansas and that of Illinois, which is the *lex loci contractus*.

The theory of successor liability is most often seen in corporate mergers and acquisitions. Even in a corporate setting, however, successor liability is the exception rather than the rule.

"Generally where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor, except: (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts

to a consolidation or merger of the corporation; (3) where the purchasing corporation is merely a continuation of the selling corporation, or (4) where the transaction is entered into fraudulently in order to escape liability for such debts." *Comstock v. Great Lakes Distributing Co.,* 209 Kan. 306, Syl. ¶ 1, 496 P.2d 1308 (1972).

The following definition of consolidation or merger was adopted:

" 'Strictly speaking a consolidation signifies such a union as necessarily results in the creation of a new corporation and the termination of the constituent ones, whereas a merger signifies the absorption of one corporation by another, which retains its name and corporate identity with the added capital, franchises and powers of a merged corporation.' " *Comstock,* 209 Kan. at 310 (quoting 15 Fletcher Cyc. Corp. [Perm. Ed.] § 7041).

This court listed the elements of a continuation in *Stratton v. Garvey Internat'l, Inc.,* 9 Kan. App. 2d 254, 676 P.2d 1290 (1984) (quoting *Jackson v. Diamond T. Trucking Co.,* 100 N.J. Super. 186, 196, 241 A.2d 471 [1968]):

"(1) transfer of corporate assets (2) for less than adequate consideration (3) to another corporation which continued the business operation of the transferor (4) when both corporations had at least one common officer or director who was in fact instrumental in the transfer. . . and (5) the transfer rendered the transferor incapable for paying its creditors' claims because it was dissolved in either fact or law."

This court's decision in *Stratton* is instructive for another reason. In that case, the court stated the theory of successor liability could be applied when the transferring entity was not a corporation. 9 Kan. App. 2d at 265-66. However, the court refused to do so, holding the plaintiff's remedy against the transferor, a partner in the predecessor firm, had not been extinguished. This court, citing K.S.A. 56-315, noted partners are jointly and severally liable for "everything chargeable to the partnership." Therefore, plaintiff still had a remedy. *Stratton,* 9 Kan. App. 2d at 264.

The same is true in this case. The plaintiffs sued the partner, and the remedy is available to them. This court also noted in *Stratton* that "[f]inancial ability to satisfy a judgment has never been the basis for any finding of liability. . . If [the defendant] is ultimately held to be accountable for any damages to the plaintiff and not be financially solvent to pay the award, then plaintiff would simply find himself in the same position as other injured

parties who, after judgment, find that the defendant is judgment proof. " *Stratton*, 9 Kan. App. 2d at 264.

Historically, the theory of successor liability has not been applied to partnerships, at least in part, it appears, because the partnership exhibits characteristics of both an entity and an aggregate of individuals. A corporation is a legal entity, independent from its shareholders. A person injured by a corporation has no cause of action against the shareholders of the corporation. "The debts of a corporation are not the individual indebtedness of its stockholders." *Iola State Bank v. Biggs*, 233 Kan. 450, 457, 662 P.2d 563 (1983).

A partnership, on the other hand, is a hybrid, an entity for some transactions and an aggregate for others. A partnership may sign contracts and own property. In that sense, it is an entity. However, it is an aggregate of individuals for purposes of profit and loss: Each partner is jointly and severally liable for debts resulting from partnership business. This includes judgments. Bromberg & Ribstein on Partnership § 1.03 (1994).

Resolution of this issue is complicated by the fact that the new partnership was negotiated, and the contracts were signed, in Illinois. The parties specifically agreed Illinois law would control contract disputes. Even if they had not specified a choice of law, Kansas adheres to the *lex loci contractus* theory of contract interpretation: The law of the place where the contract was made governs construction of the contract. *Simms v. Metropolitan Life Insurance Co.*, 9 Kan. App. 2d 640, 642, 685 P.2d 321 (1984). Illinois law controls the question of whether Grant Thornton had a contractual agreement to assume debts arising out of the Fox partnership's acts. The contract clearly states Grant Thornton is not assuming Fox's debts.

The Kansas Supreme Court has also held the law of the place of transfer controls whether successor liability will be applied. In *Brown v. Kleen Kut Mfg. Co.*, 238 Kan. 642, 646, 714 P.2d 942 (1986), the court stated:

"After examining the options, we are persuaded that the law of the jurisdiction where the corporation was formed, and where the transfer of corporate stock and assets took place, should govern the liability of a dissolved predecessor corporation and its successor corporation for injuries

arising from use of a product manufactured by the dissolved predecessor corporation."

Under Illinois law, successor liability does not apply to tortious acts committed by a previous partnership. See *Dalton v. Alston & Bird*, 741 F.Supp. 1322, 1336 (S.D. Ill. 1990) (citing *Wierzbinski v. Celina Mutual Ins. Co.*, 426 F. Supp. 27 [E.D. Wis. 1976]).

It should be pointed out that both Kansas and Illinois have adopted the Uniform Partnership Act (UPA). K.S.A. 56-301 *et seq.;* Ill. Rev. Stat. ch. 805, para. 205/1 (1992) *et seq.* UPA § 41 (K.S.A. 56-341, Ill. Rev. Stat. ch. 805, para. 205/41 [1992]) states a new partnership automatically assumes the debts of the previous partnership when there is a continuation. This is true only if the previous partnership does not liquidate its affairs. Liquidation is not defined. Liquidation could be equated with winding up one's affairs—that is, using partnership assets to pay partnership debts. Bromberg and Ribstein on Partnership § 7.18 (1994).

It should be noted that Fox is still in the process of winding up its affairs. Although the partnership is no longer engaged in accounting, it still exists for purposes of collecting partnership assets and paying partnership debts. The Fox partners are still liable for any judgment rendered against Burdge which arises out of his conduct while he was a Fox partner. How Grant Thornton allegedly concealed the continued existence of Fox is not clear from the record.

Successor liability does not apply significantly to this case. The acts complained of occurred almost totally before Grant Thornton became involved, Grant Thornton had no agreement to assume Fox's obligations and Burdge, the other partners, and Fox were still available to be sued over the acts complained-of. At worst, Grant Thornton might be responsible for what occurred while Burdge was with Grant Thornton, the scope of which is not clear from the record.

We turn next to the allegations against Burdge. This court has limited the plaintiff's case against Burdge to a claim for breach of trust for conspiracy to overcharge the trust account. *Gillespie*, 14 Kan. App. 2d at 572.

Burdge argues that the only overcharging contemplated by the court was the accountant's act of overcharging the trust for serv-

ices rendered. We cannot agree. The basis of the case was a breach of trust involving the oil and gas deals. This court held the plaintiff must be allowed the opportunity to prove a breach of trust regarding the oil and gas deals. Any other interpretation of this court's decision is contrary to the evidence.

The theory of plaintiff's case against Burdge was set out in the pretrial order:

"It is plaintiff's contention that Robert W. Burdge assisted and participated in the breach of trust by taking Pauline Brown Gillespie into his confidence and advising and guiding her in the "block investment" scheme from 1974 through 1987, with knowledge that (1) dry hole investments were being selected for the Trust after such wells had been drilled; (2) that the Trust was disproportionately billed for its share of drilling and completion costs; (3) the Trust was charged more than its fair share of operating costs on the few producing wells in which it was permitted to participate; and (4) Robert W. Burdge, along with Paul A. Seymour, Jr. and Paul Seymour III, participated in a scheme to spread available excess trust funds at year end into dry holes in which the Trust was allocated an interest during all the years from 1974 through 1987."

This court has adopted the following definition of breach of trust: "The wrong of participation in a breach of trust is divided into two elements: (1) an act or omission which furthers or completes the breach of trust by the trustee, and (2) knowledge at the time that the transaction amounted to a breach of trust, or the legal equivalent of such knowledge." *Gillespie,* 14 Kan. App. 2d at 569-70 (quoting Bogert, Trusts and Trustees § 90 [2d ed. 1982]).

The trial court found:

"71. Gillespie did not select wells for Trust or personally. This is proved by the success rate of the Trust and Gillespie compared to wells in which Trust and Gillespie did not participate.

"72. Gillespie had no knowledge of the oil business. Seymour dazzled her with maps, logs, and jargon.

"73. Gillespie did not have prior knowledge of the percentages allocated to Trust personally. This is proved by the unusually large interest of Trust and Gillespie in dry holes, compared to other investors in producing wells, and compared to Trust and Gillespie interests in producing wells.

.   .   .   .

"76. Gillespie was not aware of the sequence of 'spreading' trust and personal money . . . ."

We believe the trial court's statements indicate that in the court's opinion, Gillespie did not intentionally commit a breach of trust. The court found she was acting on Burdge's advice, who had been retained to give accounting advice. Part of this advice, according to the court, was a duty to say no to the block investment and spreading as practiced by the Trust, and a duty to explain the tax consequences of those actions.

The court also clearly found that Burdge was in collusion with Seymour, Jr. That, however, is irrelevant for proving breach of trust. Seymour, Jr. was not a trustee. Actions in which he and Burdge participated may be a tort against the Trust, but they are insufficient to support a breach of trust.

This issue is complicated by the following statement of the Supreme Court in *Gillespie I:*

"A central thread runs throughout the trial court's findings of fact—namely that Gillespie was the dominant trustee and had the final say on all trust investments. Gillespie worked with the accountants; Gillespie had the records of the Trust; Gillespie signed the tax returns; Gillespie determined how much would be invested in Arrowhead each year; and Gillespie directed that plaintiffs not be informed of Trust business. It was Gillespie who conferred with Seymour, visited the Arrowhead offices, studied oil and gas development reports, and visited drilling sites. The trial court found Gillespie had no knowledge that Seymour was stacking the deck against the Trust in its block investments through his finagling, but also found Gillespie had done some finagling of her own. Namely, she caused valuable oil interests belonging to the Trust to be transferred to her own account in exchange for less valuable interests she owned individually. From the information she had available to her, Gillespie had to have been aware the Trust's investments in Arrowhead were the equivalent of pouring money into a hole in the ground. She could have stopped investing in Arrowhead at any time, but continued to do so until the very end of her life. She commenced investing in Arrowhead to reduce tax liability. That it did accomplish." *Gillespie I,* 250 Kan. at 147.

This court must determine whether Gillespie's lack of knowledge about the abuse of the block investment scheme was a breach of trust. Clearly, a finding of breach of trust may be predicated upon failing to act as a trustee.

The Restatement (Second) of Trusts § 174 (1957) states: "The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property." Similarly, "[t]he

trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary." Restatement (Second) of Trusts § 170(1) (1957).

It seems clear that, whether or not Gillespie engaged in *acts* which harmed the Trust, any negligence (or omission) in administering the Trust could be a breach of trust. However, the issue in this case has been limited to "an action for breach of trust . . . for conspiracy to overcharge the trust account and participation in overcharging the account." *Gillespie*, 14 Kan. App. 2d at 572.

A civil conspiracy consists of the following elements: " '(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or cause of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.' " *Gillespie*, 14 Kan. App., 2d at 571 (quoting *Stoldt v. City of Toronto*, 234 Kan. 957, Syl. ¶ 5, 678 P.2d 153 [1984]).

Based on this definition of conspiracy, Burdge and Grant Thornton cannot be liable for breach of trust based on any of Gillespie's actions. If it is accepted that her breach of trust was negligence, it would be illogical to find a "meeting of the minds" (conspiracy) to act negligently. To decide to act negligently would be to decide to commit overt acts which harmed the Trust.

We do not believe Burdge committed a breach of trust by assisting the trustee through acts or omissions. The wrong which this court believed may have occurred was the affirmative act of overcharging the Trust account. Therefore, the object of the conspiracy would have been the overcharging. Having determined Gillespie did not intend to overcharge, the trial court could not hold the accountants conspired with her to overcharge.

Given the above conclusion regarding Gillespie's behavior, the plaintiffs must be shown to have proved Burdge conspired with Dorothea Seymour to overcharge the trust, and then did so. In its findings of fact, the trial court stated:

"85. Dorothea's conduct as a co-trustee from 1974 to 1988 in making block fund investments from the Trust to Arrowhead, where she and her husband, Seymour, were sole stockholders, resulted in a financial detriment to the Trust. The self-dealing in funding the drilling of oil wells developed by Arrowhead in the manner described above resulted in a financial benefit to co-trustee, Dorothea, and her husband, Seymour, and a financial det-

riment to beneficiaries. Burdge did not discuss any self-dealing problems with Gillespie.

"86. Dorothea knew Trust was paying money in excess of proportionate billings; but she testified she was unaware whether it was a benefit or detriment to the trust and a benefit to Arrowhead. No one has explained how this could be. Dorothea knew money was spread into dry holes."

These statements appear to be a conclusion that Dorothea committed a breach of trust. However, they are *not* clearly statements that she and the accountants engaged in the *same* breach.

Two elements of conspiracy are lacking in the court's conclusions. First, there was no finding that Dorothea and Burdge agreed to overcharge the Trust account. In fact, the majority of the court's opinion focuses on the acts of Burdge and Seymour, Jr. These acts, if they occurred, do not support a cause of action for breach of trust. Second there is no evidence that Dorothea engaged in or was aware of unlawful, overt acts. She testified she was aware of the investments, but did not know whether it was a benefit or detriment to the trust. The court's statement that it found this testimony lacked credibility does not equal a finding of participation in the conspiracy.

In *Gillespie I,* the Supreme Court held Dorothea was not liable for punitive damages because "[t]he trial court found Dorothea's role in the Trust's investments in Arrowhead to be passive and that she did not participate in the actual running of Arrowhead." 250 Kan. at 147. Collateral estoppel does not apply to the earlier findings because Kansas requires mutuality of parties for collateral estoppel to attach. *McDermott v. Kansas Public Serv. Co.,* 238 Kan. 462, 473-74, 712 P.2d 1199 (1986). There is no mutuality in this case. Similarly, the doctrine of law of the case does not apply for the reasons stated above; nor does the principle of res judicata apply.

To hold as a matter of law that Dorothea and Burdge agreed to participate in acts which harmed the Trust, the trial court would have had to reach a different conclusion in this case than it did in the previous case. No new evidence regarding Dorothea was presented in this case. Thus, there was no evidence upon which the court could reach a different conclusion. Consequently, there is no basis for holding Burdge liable for breach of trust based on Dorothea's acts.

There is an interesting theoretical issue presented here. The courts and the parties seem to have reached the conclusion that Gillespie and Dorothea each breached their responsibilities as trustee by not using due diligence. There also seems to be agreement that Burdge's acts were possibly unethical. Hence, we can agree that individually each person may have breached some legal or equitable duty.

Can these individual acts somehow be combined to create a conspiracy to overcharge the Trust account? If not, can the accountants still be liable for breach of trust? In theory, the answer to both questions is yes.

The district court held the accountants had a duty to say no because the block investment as practiced was not sound tax advice. This court could rule that even though the parties did not conspire, the accountants' failure to say no was an act, or omission, which allowed the trustee to commit a negligent breach of trust.

This would require this court to affirm the district court's conclusion there is a duty to say no. The district court cited no authority for this position. It cited the fact the investments were contrary to the tax laws. However, the IRS has never questioned the investments and the basis for the court's conclusion is not clear.

The court also found Burdge was not hired to give investment advice. The fact the investments were imprudent did not mean he was responsible for them. He was hired to prepare the taxes— that he did. If he conspired with Seymour, Jr. to hide the extent of the imprudence, Burdge committed a tort. But, plaintiffs do not have standing to bring a claim of fraud. See *Gillespie*, 14 Kan. App. 2d at 574. Appellees cite no cases supporting the "duty to say no." Appellants cite numerous cases reaching the opposite conclusion.

An accountant has a duty to do that which he or she is hired to do. One court has gone so far as to say an accountant has no *legal* duty to inform trust beneficiaries that a trustee is committing a breach of trust. *Painters of Phil. D. Coun. v. Price Waterhouse*, 879 F.2d 1146, 1153 n. 9 (3d Cir. 1989). In *Gillespie*, this court appeared reluctant to extend an accountant's responsibility when it accepted the reasoning of *In re Gas Reclamation, Inc. Securities*

*Litigation*, 659 F. Supp. 493 (S.D.N.Y. 1987) and *Latigo Ventures v. Laventhol & Horwath*, 876 F.2d 1322 (7th Cir. 1989). In each of those cases, the deciding court held the accountants' duties could not be expanded beyond the duties owed the client.

Ultimately, the block investment scheme achieved its purpose—tax avoidance. The costs of the savings probably outweighed the benefits. Absent any indication Burdge was responsible for the decision to make the investment, there was no breach of a legal duty.

The only substantial testimony in the record establishes that Gillespie started the whole process before Burdge was employed, showed a basic grasp of the process, and indicated no desire to change it.

We point out that in *Gillespie*, this court held that all other claims which could have been based on Burdge's action, or inaction, are barred by K.S.A. 1-402. That statute limits a certified public accountant's (CPA) liability for negligence. A CPA is liable for professional negligence only if the plaintiff directly engaged the person to perform professional accounting services. If the plaintiff did not engage the professional, liability will lie only if "the defendant knew at the time of the engagement or the defendant and the client mutually agreed after the time of the engagement that the professional accounting services rendered the client would be made available to the plaintiff, who was identified in writing to defendant, and (2) the defendant knew that the plaintiff intended to rely upon the professional accounting services rendered the client in connection with specified transactions described in writing." K.S.A. 1-402. The plaintiffs cannot meet these criteria.

To summarize:

1. There is no independent duty of an accountant to say no to a client who has decided on a noncriminal financial course of action and does not ask the accountant's advice. This is true even if the accountant does not think the course of action is a good idea and another of the accountant's clients might benefit by it.

2. There is no substantial competent evidence proving Gillespie did not know what she was doing or was being fooled. She was a canny investor, and the trial court points out her extreme

dislike for paying taxes. She started the spreading and investing scheme before Burdge became an accountant for the Trust.

3. There is no evidence Gillespie wanted Burdge's advice, and the trial court acknowledged it did not know what would have happened had advice been offered or given by Burdge.

4. Since Burdge was not shown to have engaged in a breach of trust, Grant Thornton could not have been found to have done so either.

5. Grant Thornton did not assume Charles Fox's obligations in this matter and Fox was, and apparently still is, in a posture to be sued by any of its clients claiming wrong-doing. Therefore, Grant Thornton has no successor liability for work done by Charles Fox.

The last issue we must resolve is whether the estate of Gillespie can recover against these defendants. We believe what we have decided above answers this question in the negative.

In the journal entry, the court assessed damages against Burdge and Grant Thornton in favor of Gillespie's estate. At no place in the record does the court set out the reason for assessing damages.

The estate sued Burdge and Grant Thornton on five theories: negligence, malpractice, breach of fiduciary duty, conversion and conspiracy, and fraud and conspiracy. No conclusion regarding any of these claims was rendered by this court in *Gillespie*. Thus, recovery could have been predicated on any of these theories. Without some statement by the trial court as to the cause of action on which damages are awarded, it is impossible to tell why the court believed the estate is entitled to damages.

However, regardless of the theory, there is insufficient evidence to establish liability. As we have stated, there was not sufficient evidence to prove Burdge violated any duty which he owed to Gillespie or the estate. Therefore, the estate's action against Burdge and Grant Thornton also fails.

The skilled and thorough counsel in this case filed voluminous briefs and appendices to aid the court and presented excellent oral arguments in support of their positions. In addition to the issues we have addressed, there were also arguments raised concerning whether the trial judge should have recused himself; whether the defendants were entitled to a jury trial; whether the law of the case required that any liability of the accountants to

the Trust be limited to overcharges, if any, for services rendered; whether the trial court properly awarded prejudgment interest; and whether Burdge and Grant Thornton would be entitled to indemnification or contribution from Gillespie's estate if they were held liable.

Our decision would not be changed by addressing any of these issues, regardless of the result, so we will not burden the decision with a discussion of them. For the reasons stated above, the decision of the trial court finding against the defendants Burdge and Grant Thornton is reversed.