UNITED STATES of America,
Plaintiff–Appellee,

v.

Fred NAPIER, Defendant–Appellant.

No. 87–3076.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 1, 1988.

Decided Nov. 8, 1988.

As Amended Nov. 25, 1988.

C.J. Seifert, Gough, Shanahan, Johnson & Waterman, Helena, Mont., for defendant-appellant.

Robert L. Zimmerman, Asst. U.S. Atty., and Byron H. Dunbar, U.S. Atty., Billings, Mont., for plaintiff-appellee.

Before FLETCHER and NORRIS,* Circuit Judges, and AGUILAR, District Judge.**

WILLIAM A. NORRIS, Circuit Judge:

Appellant Fred Napier is a former Montana Commissioner of Financial Institutions, an office in the state's Department of Commerce. As Commissioner, Napier supervised the regulation of all state-chartered financial institutions. It was his job to oversee the conduct of bank examinations and to act on the findings of those examinations. While serving as Commissioner, Napier obtained a loan from James Edmiston, the president of a bank-holding company which owned a number of state-chartered banks that were insured by the Federal Deposit Insurance Corporation. As a result of accepting this loan, Napier was tried and convicted of violating 18 U.S. C. § 213, which provides in relevant part:

> Whoever, being an examiner or assistant examiner of member banks of the Federal Reserve System or banks the

---

* Judge Norris was drawn to replace the late Judge J. Blaine Anderson on this panel. Judge Norris has read the briefs and reviewed the record.

** The Honorable Robert Aguilar, United States District Judge for the Northern District of California, sitting by designation.

deposits of which are insured by the Federal Deposit Insurance Corporation ... *accepts a loan* or gratuity *from any bank,* corporation, association or organization *examined by him* or from any person connected therewith, shall be fined not more than $5,000 or imprisoned not more than one year, or both.... (Emphasis added.)

Napier's conviction cannot stand because there is no evidence that Napier had examined any bank with which Edmiston was connected prior to the time that he received the loan. Nor is there any evidence that the Montana Department of Commerce had examined any such bank between the time that Napier was appointed Commissioner and the time that Edmiston made the loan. All the evidence shows is that the Department of Commerce routinely conducted bank examinations [1] and that Napier, as Commissioner of Financial Institutions, had the authority to examine banks and to close a bank if it failed the examination. In our view the statute is clear on its face: it prohibits a bank examiner from accepting a loan from a bank or any person connected with a bank that has been examined by him. On its face the statute does not prohibit a person from accepting a loan from a bank not examined by him. Thus, we need not decide the question whether Napier, as Montana's Commissioner of Financial Institutions, was a "bank examiner" within the meaning of section 213, because the statute is clear that even if he was a bank examiner for purposes of the statute, he had not examined any bank with which Edmiston was connected when he received the loan.

The government argues that this reading of section 213 "eviscerates" the statute. The government asserts that Congress enacted section 213 to ensure that the examination of banks was conducted by non-biased objective examiners. It would be "ridiculous," the government claims, to except from the statute those who have the authority to examine banks or who possess ultimate responsibility for deciding the Department's response should a bank fail an examination. Because a person in Napier's position could potentially exploit his office by promising favorable treatment in the future to any bank that loaned him money, the government argues, Congress must have intended section 213 to prohibit all those with authority to examine banks from accepting loans or gifts from them.

These are powerful arguments. Our only response is that we are bound by the plain language of the statute, which states that an examiner of banks cannot "accept a loan or gratuity from any bank ... examined by him." When the statutory language is unambiguous, in the absence of "a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The government has cited no legislative history that reveals a clear intent on Congress' part to prohibit all those who have authority to examine a bank from accepting loans. Instead the government casts its arguments in terms of general statutory purposes. What the government is basically saying to this court is that the statute was badly drafted and that we should revise it. This we cannot do, especially since we are interpreting a criminal statute.

"It has long been settled that 'penal statutes are to be construed strictly,' *Federal Communications Comm'n v. American Broadcasting Co.,* 347 U.S. 284, 296, [74 S.Ct. 593, 601, 98 L.Ed. 699] and that one 'is not to be subjected to a penalty unless the words of the statute plainly impose it,' *Keppel v. Tiffin Savings Bank,* 197 U.S. 356, 362 [25 S.Ct. 443, 445, 49 L.Ed. 790]" *United States v. Campos–Serrano,* 404 U.S. 293, 297 [92 S.Ct. 471, 474, 30 L.Ed.2d 457] (1971). This principle is founded on

---

**1.** The evidence showed that one of the banks with which Edmiston was connected was audited by the Montana Department of Commerce on August 1, 1983, November 30, 1984, and April 25, 1986. Napier did not become Commissioner until the summer of 1985. He borrowed the money from Edmiston in November 1985. Thus, there is no evidence that the Department of Commerce or Napier examined any of Edmiston's banks during the whole of 1985.

the sound policy that before criminal penalties can be imposed "fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle v. United States*, 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931) (Holmes, J.).

Moreover, a strict reading of section 213 appears all the more justified when we compare the section to section 212 of the statute, which was enacted at the same time. In section 212, Congress provided, in relevant part, that:

> Whoever, being an officer, director or employee of a bank which is a member of the Federal Reserve System or the deposits of which are insured by the Federal Deposit Insurance Corporation ... makes or grants any loan or gratuity, to any examiner or assistant examiner *who examines or has authority to examine such bank* ... shall be fined not more than $5,000 or imprisoned not more than one year, or both.... (Emphasis added.)

Thus, Congress included language in section 212 which expressly prohibits a bank officer or employee from making a loan or gift to any person who "examines or has authority to examine [the] bank." Section 213 has no similar language. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983), citing *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972). It very well may be, as the government argues, that Congress' purposes would be better served if the language in section 213 tracked the language of section 212, but it does not. If this is an unintended omission in section 213, Congress can easily correct itself by amending the statute. It is not, however, for this court to rewrite the statute for Congress.

We are unpersuaded by the government's reliance on *United States v. Bristol*, 473 F.2d 439 (5th Cir.1973). In *Bristol*

the Fifth Circuit considered whether it violated section 213 for a bank officer to make a loan to a bank examiner through a shell corporation which the bank officer controlled. The examiner in that case contended that because the bank officer had not personally made the loan, (but instead had arranged for the controlled corporation to make it), the bank examiner was not prohibited by section 213 from accepting it. While recognizing that penal statutes should be construed strictly, the court stated that a common sense construction was permitted when strict construction would defeat the obvious intent of Congress. *Id.* at 441–42, citing *Ryan v. United States*, 278 F.2d 836, 838 (9th Cir.1960). In *Bristol*, the Fifth Circuit held that it defied common sense and the presumed intent of Congress to allow a person to circumvent the prohibitions of section 213 by channeling the loan through another corporation. *Id.* at 442. The government relies on *Bristol* as establishing the principle that section 213's literal meaning can be ignored whenever common sense would dictate that Congress intended some result not expressly provided for in the statute.

We do not believe that the Fifth Circuit created any such principle or that *Bristol* has any applicability to the present case. In *Bristol*, the court was interpreting an ambiguous portion of section 213: what Congress meant when it prohibited a bank examiner from accepting a loan or gift "from any bank ... or person connected therewith." A common sense interpretation was needed to give fair meaning to the term "from," since it was difficult to tell whether Congress meant that a bank officer could not loan money directly to an examiner, or that he could not cause a loan to be made to the examiner. In the instant case, the language is not ambiguous; the bank must have been "examined by" the bank examiner before the examiner's acceptance of a loan is criminalized under section 213.

In conclusion, we reverse Napier's conviction because there is no evidence that he had ever examined the bank with which

Edmiston was connected at the time that he accepted the loan.

The conviction is REVERSED.