No. 71,138

JOYCE H. CRANDON, *Appellant*, v. STATE OF KANSAS, KANSAS BANKING COMMISSION, and FRANKIE D. DUNNICK, *Appellees*.

(897 P.2d 92)

Opinion filed June 2, 1995.

*Alan L. Rupe*, of Rupe & Girard Law Offices, P.A., of Wichita, argued the cause, and *Thomas L. Steele*, of the same firm, was with him on the briefs for the appellant.

*Carl A. Gallagher*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, argued the cause, and *Nancy L. Ulrich*, assistant attorney general, and *Robert T. Stephan*, attorney general, were with him on the brief for the appellee.

*Mark F. Anderson,* of Topeka, was on the brief for *amicus curiae* The Disciplinary Administrator of Kansas.

*Jim Lawing,* of Wichita, was on the brief for *amicus curiae* American Civil Liberties Union of Kansas.

The opinion of the court was delivered by

ABBOTT, J.: Plaintiff Joyce Crandon brought this action after she was discharged from her position as general counsel for the Office of the State Banking Commissioner (OSBC). Plaintiff had reported to the FDIC alleged violations of federal and state law committed by the Deputy Commissioner, Judi Stork. Plaintiff alleged a common-law whistle-blowing retaliatory discharge claim, a claim for violation of K.S.A. 1994 Supp. 75-2973, and a 42 U.S.C. § 1983 (1988) claim for violation of her First Amendment right to free speech. Plaintiff later sought to amend her complaint to include a free speech retaliatory discharge claim. The trial court granted the defendants' motion for summary judgment. Plaintiff appealed, and the case was transferred to this court from the Court of Appeals.

The trial court found the following undisputed facts:

"Ms. Crandon carried the title of general counsel to the office of the state bank commissioner [defendant Dunnick] and had the status of an assistant attorney general. She began upon her duties on November 18, 1991. Her position was in the unclassified civil service. See, K.S.A. 75-3135; K.S.A. 75-2935(1)(j) and (m). As such, she had no tenure and was an 'at will' employee. Compare, *Riddle v. City of Ottawa,* 12 Kan. App. 2d 714, 716-19 (1988), pet. rev. den., 243 Kan. 780 (1988).

". . . . [I]t is the state bank commissioner who has the principal authority under K.S.A. 9-1701 et seq. to execute the laws and to examine and regulate banks.

". . . . The state bank commissioner is appointed by the governor and confirmed by the State Senate. It is the bank commissioner's duty to administer the state's banking laws. . . . Further authorized is a deputy commissioner appointed by the commissioner. The Deputy Commissioner is in the unclassified civil service and enjoys no tenure, but serves at the pleasure of the state bank commissioner. See, K.S.A. 75-3135.

"The remaining staff of the agency, exclusive of clerical personnel, consists of individuals holding office and authority as 'examiners' whose duties involve actual performance of, or supervision of, examinations of state chartered banks. All these personnel, as well as clerical staff, hold positions in the state classified civil service

system, meaning they are not subject to dismissal without cause. See, K.S.A. 75-3135; 75-2935(2).

"It was the duty of Ms. Crandon to act as the legal advisor to, and attorney for, this agency. Beginning approximately April to May 1992, one of the review examiners, Erik Berggren, became aware that the Deputy Commissioner, Judi Stork, who had held appointment in the agency since 1981, first as an examiner and subsequently, at the time in question, in the position of deputy commissioner, could be considered to have existing loans from two state chartered banks, the State Bank of Baileyville, also a bank in which her financial disclosure statement filed pursuant to K.S.A. 46-247 et seq. disclosed she had a 'substantial interest', and from the Southwest Bank and Trust in Topeka.

"One loan from the State Bank of Baileyville consisted of a note signed only by her husband, but the resulting mortgage on her home was signed by both [her] and her husband. Other loans consisted of a series of overdrafts on a personal checking account she held with that bank. Another loan existed at the Southwest Bank and Trust upon which, although Mrs. Stork was not a signatory to the loan documents, the collateral, a car, was titled in the name of she and her husband, he being the sole signator on the loan. For the purposes here it is not necessary for the court to determine whether, in fact, Mrs. Stork was a loan recipient in each circumstance, however, for the purpose of defendants' motion the court shall presume in each instance she was a loan recipient.

". . . Mr. Berggren believed that such loans placed Mrs. Stork not only in violation of the agency's own internal written ethics code, but also constituted a violation of state and federal banking laws.

"In this regard, K.S.A. 9-1701(a) provides:

'The commissioner or the commissioner's assistant or examiners shall visit each bank and trust company at least once every 18 months, and may visit any bank or trust company if the commissioner deems it necessary, for the purpose of making a full and careful examination and inquiry into the condition of the affairs of such bank or trust company. For such purpose the commissioner, the commissioner's assistant and examiners are authorized to administer oaths and to examine under oath the directors, officers, employees and agents of any bank or trust company. Such examination shall be reduced to writing by the person making it and such person's reports shall contain a full, true and careful statement of the condition of such bank or trust company. The commissioner in lieu of making a direct examination and inquiry may accept the examination and report of an authorized federal agency. The commissioner shall provide to the board of directors of the bank or trust company a copy of the examination report written by the state examiners. Neither the commissioner, the commissioner's assistant nor any examiner shall examine any bank or trust company in which the person making such examination is a stockholder or is otherwise financially interested or to which bank or trust company or any officer thereof the person making the examination is indebted.' (Emphasis supplied.)

"Also noted is 18 U.S.C. 213 which provides:

'Whoever, being an examiner or assistant examiner of member banks of the Federal Reserve System, financial institutions the deposits of which are insured by the Federal Deposit Insurance Corporation, which are branches or agencies of foreign banks (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978 [12 USCS Sec. 3101(1), (3)]), or which are organizations operating under section 25 or section 25(a) of the Federal Reserve Act, or a farm credit examiner or examiner of National Agriculture Credit Corporations, or an examiner of small business investment companies, accepts a loan or gratuity from any bank, branch, agency, corporation, association or organization examined by him or from any person connected therewith, shall be fined no more than $5,000 or imprisoned not more than one year, or both; and may be fined a further sum equal to the money so loaned or gratuity given, and shall be disqualified from holding office as such examiner.' (Emphasis supplied.)

"Further, to be noted, as it will be addressed subsequent, is 12 U.S.C. 1289, as amended, as here relevant:

'(a) Prohibition

(1) In general

Except with the prior written consent of the Corporation—

(A) any person who has been convicted of any criminal offense involving dishonesty or a breach of trust, or money laundering or has agreed to enter into a pretrial diversion or similar program in connection with a prosecution for such offense, may not—

(i) become, or continue as, an institution-affiliated party with respect to any insured depository institution;

(ii) own or control, directly or indirectly, any insured depository institution; or

(iii) otherwise participate, directly or indirectly, in the conduct of the affairs of any insured depository institution';

"Further, in reference to the above statute, the phrase 'institution affiliated party' is defined in 12 U.S.C. 1813(u), as here relevant as follows:

'(1) any director, officer employee, or controlling stockholder (other than a bank holding company) of, or agent for, an insured depository institution;

. . .

(3) any shareholder (other than a bank holding company), consultant, joint venture partner, and any other person as determined by the appropriate federal banking agency (by regulation or case-by-case) who participates in the conduct of the affairs of an insured depository institution;

. . .'

"Subsequent, probably in April to May or June 1992, Mr. Berggren first brought his concerns to Ms. Crandon's attention. Further, this underlying factual situation concerning Mrs. Stork became a part of a civil service hearing in a termination

proceeding initiated by the Commissioner regarding an employee (not related to this case) that had been appealed by the employee examiner to the state civil service board at which Ms. Crandon appeared in defense of the agency action. The employee had been terminated based on her conviction for violating 18 U.S.C. 213. The issue at note arose from an apparent 'what's good for the goose is good for the gander' defense claiming that Mrs. Stork had loans with the state chartered banks and she was not terminated. The terminated employee was reinstated by the civil service board. This hearing was on July 6, 1992. Ms. Crandon had argued before the Kansas civil service board that Mrs. Stork was not in violation of any such laws and the circumstances were not comparable. . . . .

"Mrs. Stork's circumstance was also raised by state bank examiners as a part of the regular examination of the State Bank of Baileyville on going circa this same period. At one point in June 1992, and again the week of July 6, 1992, Ms. Crandon made, on each occasion, a phone inquiry to the Federal Deposit Insurance Corporation regional office in Kansas City, specifically, to Mr. Lamberti, its regional counsel, whether in his view Mrs. Stork's circumstances were in violation of federal law, specifically 18 U.S.C. 213. Mr. Lamberti subsequently has testified that he did not perceive a violation, but that such an issue was an internal one for the state agency. Admittedly, he said his response was ad hoc and without research. Notwithstanding, in considering defendants' motion the court will consider Mr. Lamberti's response as sufficiently ambivalent such that plaintiff might believe his response at least left a question raised as to the violation of federal law.

"Sometime during the week of July 6, 1992, Ms. Crandon advised Mr. Berggren to turn the matter over to the FDIC, which he did. Mr. Berggren has testified he would have done so in any manner notwithstanding any advice of Ms. Crandon.

"Subsequently, and for the purpose of the motion and taken as true, Commissioner Dunnick learned at a meeting with the FDIC on July 9, 1992, of Mr. Berggren's reporting to the FDIC, Ms. Crandon's advice to him to do so, and her inquiries to Mr. Lamberti.

"At no time prior to her termination, except during questioning at the civil service hearing on July 6, 1992, when Mrs. Stork and Mr. Dunnick were called as witnesses, had Ms. Crandon personally talked with Mr. Dunnick or Mrs. Stork about Mrs. Stork's status vis a vis the identified loans and whether Mrs. Stork's loan circumstances violated federal or state banking laws, state ethics statutes, or internal agency ethics policy.

"At no time prior to Ms. Crandon's termination did Ms. Crandon attempt, in any manner, to persuade Mr. Dunnick, as the agency's head, that he should affirmatively act in some fashion under his authority as Commissioner to remedy the situation she believed was presented arising from the fact of Mrs. Stork's loans.

"Ms. Crandon asserted through counsel at oral argument in this case that she made one phone call to the attorney general's office and was told they don't give opinions on criminal matters. The person called is not identified.

"There is no evidence Ms. Crandon contacted any member of the banking board or the Governor's office before her termination.

"For the purpose of the motion, it is assumed Mr. Berggren told Ms. Crandon that he had discussed the loans with Mrs. Stork and that he had brought them to the attention of Commissioner Dunnick who said he would look into it. The conversations between Berggren, Stork, and Dunnick probably occurred prior to May 27, 1992.

"Whether Ms. Crandon knew Mrs. Stork had told Mr. Berggren she had never had authority to examine the State Bank of Baileyville since she first came to the agency or that Mrs. Stork had closed her checking account at the State Bank of Baileyville is unclear. However, she did not know that Mrs. Stork had replied to the inquiries by memo to the commissioner. Notwithstanding, these facts could have been confirmed by agency documents or official inquiry to the bank. Ms. Crandon did not see these documents and the response of Mrs. Stork to inquiries posed to her as to her authority to examine the State Bank of Baileyville when she was a witness, under oath, in the Emery civil service hearing were that she had no such authority. Ms. Crandon knew from Mr. Berggren that Commissioner Dunnick had reviewed the matter by June 1, 1992, and had concluded Mrs. Stork's situation violated no state policy, but she did not know the basis for his decision except for what she may have learned at the civil service hearing.

"Further, no evidence has been proffered by the plaintiff that she had any other source of factual information to form any opinion that Mrs. Stork's loans were in violation of any law or policy other than by talking to Mr. Berggren or to Mr. Lamberti, except to confirm by inspection at the Record of Deeds' office that the ownership of the property and the mortgage on it to the State Bank of Baileyville was in both Mr. and Mrs. Stork's name and to confirm title to the motor vehicle subject of the loan and lien of Southwest Bank and Trust was likewise in their names. Plaintiff is unable to say what, if any, case law she reviewed prior to any advice to Mr. Berggren or used in the formulation of any opinion of wrongdoing other than *St. Francis Hospital v. Browles*, 251 Kan. 334 (1992), which explains the doctrine of necessaries vis a vis one's spouse's liability for the debts incurred by the other. The statutes or regulations upon which she stated she relied were K.S.A. 9-1701, 12 U.S.C. 213, 12 U.S.C. 1289, and 12 C.F.R., part 215.

"Plaintiff proffers no evidence existing at the time of her report to support her assertion that Mrs. Stork had unlawfully examined the Southwest Bank and Trust or interfered with the examination of the State Bank of Baileyville. Ms. Crandon did state she believed Mrs. Stork had authority to examine any Kansas bank. Ms. Crandon states she investigated whether Mrs. Stork was in violation of 12 U.S.C. 1289 by examining Case 82 CR 234 in the Shawnee County District Court and Mrs. Stork's disclosure of substantial interest statements filed with the Secretary of State, but did not discuss with anyone, but Mr. Berggren, whether Mrs. Stork's prior diversion agreement placed her in violation of federal law because she had an ownership interest in the bank. She undertook no other investigation nor inquiry. There is no evidence the subject matter of her 12 U.S.C. 1289 inquiry was part of any 'whistleblowing' claim or that Mr. Dunnick knew of it, however, it is accepted by the court as advanced as one motivation by Ms. Crandon for her

'reporting' activity and procedure. Of course, factual information arising after her 'reporting' would not be a proper standard to test the reasonableness of her belief at the time of reporting.

"It seems substantially clear and not reasonably subject to material dispute what Ms. Crandon's 'whistleblowing' and/or 'free speech/public concern' communication claim is alleged to be. It consists of up to two inquiries to Mr. Lamberti of the FDIC concerning loans made to a spouse of what Ms. Crandon represented was a deputy commissioner or 'supervisory examiner' and, for the purpose of this matter, further inquiries and reporting of the circumstances concerning such loans to the FDIC by Erik Berggren which, though encouraged by Ms. Crandon, Mr. Berggren would have proceeded on in such manner in any fashion.

"The plaintiff's claim is that she was terminated by her employer, the state bank commissioner, for this collective 'reporting' to the FDIC."

Defendants moved for summary judgment on all of plaintiff's claims. The trial court granted the defendants' motion. Resolving disputed facts in plaintiff's favor, as the court was required to do, the court found that but for plaintiff's acts of communication to the FDIC, she would not have been terminated. The court also assumed that Commissioner Dunnick was aware of the communication. Central to plaintiff's claims, the court found, was the issue whether the communications were legally protected under the circumstances so as to insulate plaintiff from termination, an issue of law.

In evaluating the issue, the trial court found that the plaintiff had spoken on a matter of public concern. However, the court found that the flaw in plaintiff's claim was based on uncontroverted facts. First, she was the attorney for the agency whose employee was "reported" upon. The knowledge plaintiff had was derived from her position as the OSBC's attorney. She took no steps to present her concerns to the OSBC's head, Commissioner Dunnick, who had the authority to act against the employee alleged to be violating the law. The court found that plaintiff's reporting was contrary to the Model Rules of Professional Conduct (MRPC), adopted by this court in Supreme Court Rule 226 (1994 Kan. Ct. R. Annot. 286), and that there was no justification for plaintiff's failure, as the OSBC attorney, to approach, counsel, and advise Dunnick on the issue. Moreover, the court found that plaintiff proceeded on her course of conduct without more than a second-

hand knowledge of the facts rather than relying on her own independent investigation. She did not report the full facts to her FDIC contact, Mr. Lamberti, because she did not know the full facts, including whether Stork had ever examined the Southwest Bank and Trust or personally participated in the examination of the State Bank of Baileyville.

The trial court further found that the statutes thought to have been violated by Stork, 18 U.S.C. § 213 (1988) and K.S.A. 9-1701(a), were not applicable unless Stork had in fact examined either of the banks in question or had interfered in or passed upon a matter in the examination of the banks. The court also found that whether Stork had violated 12 U.S.C. § 1829 (1988), which prohibits a person who has entered into a diversion agreement from being involved in a financial institution without prior approval by the FDIC, was irrelevant because the prior diversion was not reported to the FDIC by plaintiff; the court further found that even if the claim was relevant, plaintiff never determined whether Stork had obtained written permission from the FDIC and there was a question whether the statute applied to Stork's minimal ownership interest (a 4.9% share of stock in a bank holding company that owned the State Bank of Baileyville).

The trial court held that to establish a whistle-blowing claim, plaintiff must establish that a reasonable person in her shoes, an attorney, would believe that a violation of law or matter of public concern existed and that the whistle-blowing was made in good faith and not for a corrupt or otherwise specious motive. The court found both a lack of good faith and a lack of good motive based on plaintiff's avoidance of a professional duty to her clients and her rush to judgment on supposition and surmise. Moreover, if the information was confidential when communicated because of the omission of a duty to a client or the lack of consultation with the client, the communication would grossly undermine the working relationship between the client and attorney and the balance of free speech and whistle-blower protection should not attach. The court pointed out that here the attorney-client relationship was not only neglected, but wholly abandoned.

The court pointed out that plaintiff's actions, taking the matter out of the hands of the OSBC, embarrassed Dunnick; how, after that, could the attorney-client or boss-employee relationship continue? Moreover, no exigency required plaintiff to avoid the procedures set forth in MRPC 1.13(b) (1994 Kan. Ct. R. Annot. 328) to counsel her clients. The court pointed out that plaintiff's actions were not the reasonable acts of an attorney toward her clients. Plaintiff's actions were those of an attorney representing herself rather than her clients.

The trial court did acknowledge that plaintiff's violations of the Model Rules of Professional Conduct did not present an absolute bar to her claims. However, where plaintiff's claims are based on public policy and the right to speak on matters of public concern, those rights must be balanced with responsibility. Because of plaintiff's noncompliance with the ethical rules of her profession, her claims were found to be significantly diminished. Citing various authority, the court found that where the asserted rights did not interfere with the employment position, termination was not permitted, but where the right asserted impaired or impeached the working relationship, termination was permitted. The court, in essence, found that plaintiff's exercise of her rights substantially interfered with her working relationship with her clients.

The court concluded:

"The balancing of Ms. Crandon's interests under the First Amendment when weighed with her non-compliance with the tenets of her profession and the interest of the State of Kansas in properly assuring the fulfillment of the proper duties of the general counsel for the agency as well as the duties of the state bank commissioner to administer his office in the first instance, require Ms. Crandon's claims to be dismissed under the principles of law announced in *Connick v. Myers*, [461 U.S. 138, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983)], and *Pickering v. Board of Education*, [391 U.S. 563, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968)].

"Mr. Dunnick was well within his discretion to end a public and professional relationship Ms. Crandon had completely and inappropriately destroyed without fear of legal recourse by Ms. Crandon."

Addressing plaintiff's claim under K.S.A. 1994 Supp. 75-2973, the court found that plaintiff disclosed information which was confidential pursuant to MRPC 1.6(a) (1994 Kan. Ct. R. Annot. 310) and MRPC 1.13(b) and until she satisfied those rules, plaintiff had

no duty or privilege to disclose the information. Some of the information (that obtained from the bank examination documents) was also confidential under K.S.A. 9-1712 without the Commissioner's approval. Moreover, the court found that no reasonable attorney would have perceived the conduct of the defendants as the basis for an out-of-agency report at the time it was made. The court specifically found that information which is confidential under the Model Rules of Professional Conduct is confidential "under any other provision of law" as that phrase is used in K.S.A. 1994 Supp. 75-2973(c)(4)(C), which permits discipline of an employee who releases confidential information. Additionally, the court found that plaintiff's knowledge that Stork had overdraft loans was confidential information.

Plaintiff appeals the trial court's ruling. This court permitted the ACLU and the Kansas Disciplinary Administrator to file briefs as *amici curiae.*

## I. SUMMARY JUDGMENT

The plaintiff contends that the trial court erred in making certain findings of fact. She points out, correctly, that the trial court and this court must resolve all facts and inferences which may be drawn from the evidence in her favor as the party opposing summary judgment. See *Kerns v. G.A.C., Inc.*, 255 Kan. 264, 268, 875 P.2d 949 (1994).

First, the plaintiff argues that the trial court erred in concluding that she had reported on the OSBC and Dunnick. She claims that she reported only on the actions of Stork in her individual capacity. However, nowhere does the trial court find that plaintiff reported on the OSBC and Dunnick. Plaintiff is correct in suggesting that she reported on the actions of Stork. It does not appear that the trial court found otherwise.

Second, plaintiff argues that the trial court erred by resolving state of mind and motivation against her. She contends the trial court wrongfully accuses her of "assumption of agency power and authority to herself" and "her rush to judgment on supposition and surmise." Plaintiff cites *Hein v. Lacy*, 228 Kan. 249, 616 P.2d 277 (1980). In *Hein*, this court cautioned against granting summary

judgment when resolution of the dispositive issue necessitates a determination of the state of mind of one or both of the parties. 228 Kan. at 256. The plaintiff is correct that there is no evidence she had a corrupt motive or was being vindictive. However, the quotes she points to from the trial court's journal entry concerning her actions do not show that the trial court determined her state of mind and motivation.

Third, the plaintiff argues that the trial court erred in concluding that she reported confidential information to the FDIC. Plaintiff suggests that the information concerning Stork's mortgages, car loans, and her diversion for theft of services were matters of public record. She also suggests that the trial court erred in relying on K.S.A. 9-1712, which provides that "[a]ll information the state bank commissioner generates in making an investigation or examination of a state bank or trust company shall be confidential information," because that statute must be strictly construed to mean documents generated only by the Commissioner. Plaintiff's construction, though not clearly argued, seems to be that documents prepared by other sources, including by OSBC employees other than the Commissioner, are not covered by that statute. That construction is incorrect because the term "generates" encompasses documents prepared at the Commissioner's direction, including documents prepared during the course of an OSBC investigation or examination of a bank or trust company. Plaintiff also argues that K.S.A. 9-1712(b) provides that confidential information may be disclosed upon written approval of the Commissioner. She reasons that the OSBC office policy of communicating information to the FDIC on a regular basis satisfies the approval necessary under subsection (b). It does appear that the OSBC had a policy of communicating information generated during bank examinations to the FDIC. However, the real issue concerning confidentiality relates to the fact she was attorney for OSBC. Simply stated, attorneys have a different relationship than other employees, and their conduct is measured by a different standard.

Finally, plaintiff argues that the trial court erred in determining that she did not make an adequate investigation of the facts. She suggests that this issue was not raised by the defendants and that

the trial court should not have resolved it without giving the parties the opportunity to supplement the record. Nothing in the record, however, shows that the plaintiff attempted to supplement the record concerning this issue after the trial court's entry of judgment. Without our determining whether the plaintiff's investigation was "adequate," the record reflects the trial court found that plaintiff did "confirm by inspection at the Record of Deeds' office that the ownership of the property and the mortgage on it to the State Bank of Baileyville was in both Mr. and Mrs. Stork's name and . . . confirm title to the motor vehicle subject of the loan and lien of Southwest Bank and Trust was likewise in their names." The plaintiff also tells this court she reviewed federal and state statutes, case law, regulations, and internal ethics memoranda. The trial court did not ignore other aspects of investigation plaintiff claims to have done. The court merely found that plaintiff should have investigated whether Stork had actually examined or participated in examining the Southwest Bank and Trust and the State Bank of Baileyville. The plaintiff does not suggest she engaged in such investigation.

## II. MODEL RULES OF PROFESSIONAL CONDUCT

The court held that plaintiff's actions were contrary to the Model Rules of Professional Conduct, citing MRPC 1.2 Scope of Representation (1994 Kan. Ct. R. Annot. 295), 1.4 Communication (1994 Kan. Ct. R. Annot. 302), 1.6 Confidentiality of Information (1994 Kan. Ct. R. Annot. 310), 1.13 Organization as a Client (1994 Kan. Ct. R. Annot. 328), and 1.16 Declining or Terminating Representation (1994 Kan. Ct. R. Annot. 338).

The plaintiff argues that her conduct did not violate the Model Rules. She focuses on MRPC 1.6 and MRPC 1.13 and argues that she did not violate the rule of confidentiality. She points out that she had no attorney-client relationship with Stork or her husband, the persons she reported on. Stork was merely a constituent of her organization client, the OSBC. See MRPC 1.13. Moreover, the plaintiff argues, Stork never asked for plaintiff's legal advice. The plaintiff also reiterates that the facts she conveyed were in the public domain, and she did not convey the information to entities

other than the FDIC, such as the press. The plaintiff insists that she did not breach the attorney-client relationship she had with the OSBC. She maintains that the information was conveyed in a manner consistent with the established policy of the OSBC to convey information to the FDIC; she contends this policy permitted her to convey information to the OSBC without obtaining prior approval from Commissioner Dunnick. Finally, the plaintiff contends that K.S.A. 1994 Supp. 75-2973(b)(2) exempts her from obtaining prior approval.

The defendants' response is that confidences arise even when the person involved does not approach the attorney. The defendants suggest that plaintiff had a duty to keep Dunnick reasonably informed on all matters related to the representation. Because, according to defendants, violations of state and federal banking laws were within the scope of plaintiff's representation, strict confidentiality attached regardless of the source of the information, and plaintiff had a duty to explain the matters to the client. Moreover, defendants argue, trust and confidentiality are at the core of an attorney-client relationship. The attorney's duty is to advise and counsel, not prosecute her client. The defendants also point out that the drafters of the MRPC rejected a rule which would have permitted an organizational attorney to reveal information otherwise protected if the attorney deemed it necessary in the best interest of the organization. The defendants conclude that plaintiff was Commissioner Dunnick's attorney and that she had a duty to advise him on legal matters in the operation and function of the OSBC. They point out that she obtained information during the course of her representation that Deputy Commissioner Stork may have violated state or federal banking laws, but the only comment Dunnick had heard plaintiff make was her argument during the Emery civil service hearing that Stork had not violated any laws. This followed plaintiff's presentation of evidence (largely by leading questions) from Stork that her conduct did not violate any laws, rules, regulations, or guidelines. Therefore, the defendants reason, the plaintiff had a duty to counsel Dunnick as to her belief that Stork may have in fact violated laws. Because plaintiff went to the FDIC rather than to Dunnick, the essence of confidentiality was

breached. Finally, the defendants reason that it is irrelevant that Stork did not seek plaintiff's advice because organizational attorneys have a duty to advise constituents of potential conflicts and because that did not excuse plaintiff's duty to inform the Commissioner about any actions he needed to take.

We believe the parties have become overly technical and argumentative about the trial court's language. The trial court in general held that an organization's general counsel has obligations different than those of other employees. In using the balancing test discussed below, an attorney's obligation (as general counsel) is first and foremost to the organization. The balancing test as applied here includes the factors that general counsel reported a suspected violation or violations to an outside agency without first consulting with the head of the organization and that had she done so she would have learned that no violations had occurred. Whether plaintiff violated the Model Rules of Professional Conduct is not the determinative factor, and in fact a finding of no violation can be of no comfort to her.

The balancing test is set forth in *Connick v. Myers*, 461 U.S. 138, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983), and *Pickering v. Board of Education*, 391 U.S. 563, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968), and weighs an employee's First Amendment rights against the interests of the State as an employer in promoting the efficiency of the public services it performs through its employees.

In *Connick*, an assistant district attorney was involved and the United States Supreme Court said: "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." 461 U.S. at 151-52. The Supreme Court held the discharge of the assistant district attorney did not offend the First Amendment.

The *Connick* Court also held that whether an employee's right to speak on a matter of public concern outweighs the government employer's interest in effectively providing services is a question of law and is subject to de novo review. See 461 U.S. at 150 n.10.

In *Goffer v. Marbury*, 956 F.2d 1045 (11th Cir. 1992), an attorney claimed wrongful discharge for exercising First Amendment rights. The court used language we deem applicable to our case:

"The existence or not of attorney-client relations also bears on whether there was present the 'close working relationshi[p]' referred to in *Connick* that gives rise to a 'wide degree of deference' to the employer's judgment. *Connick*, 461 U.S. at 151-52, 103 S. Ct. at 1692. Moreover, definition of Goffer's role with relation to defendants is prerequisite to addressing whether her speech so destroyed her effectiveness in that role that the government interest must prevail over her speech interest." 956 F.2d at 1051.

The Alabama Rules of Professional Conduct at issue in *Goffer*, as do the Kansas Model Rules of Professional Conduct, describe the role of an organization's attorney in the attorney's responsibilities owed to the organization and to the officers and employees of the organization.

As we view the matter, plaintiff was discharged because she was general counsel for the OSBC. The head of the OSBC had been advised of Stork's possible violations, at least as to the bank audit, and had determined there was no violation. He then attended a civil service hearing in which plaintiff put Stork on the witness stand to establish that she had not violated any federal or state laws and that no rules, regulations, or internal policies had been violated. Plaintiff argued to the hearing panel that Stork's testimony was that no violation had occurred.

The OSBC head then attended a meeting with FDIC officials involving other matters and he learned for the first time that plaintiff had twice reported possible violations (once prior to the civil service hearing and a second time either immediately preceding or immediately after the panel hearing, based on largely different facts) to the FDIC without checking facts that were available to her which would have changed a reasonable attorney's mind. Whether the second reporting by plaintiff to the FDIC occurred before or after the panel hearing is not clear. The panel hearing was held on July 6, and the second telephone call reporting the alleged violations occurred (according to plaintiff's testimony) the first week in July.

Plaintiff's position as chief counsel for the organization required a close working relationship with Dunnick. Dunnick relied on plaintiff for legal advice for his guidance and for the guidance of the organization and its employees. The organization's attorney has

a responsibility to give advice when necessary to prevent or rectify unlawful or improper acts of the organization and its employees. This advice must be given by presenting the attorney's opinion to the proper person or persons in the organization who have the authority to correct the problems. A close relationship and need for trust are essential in an attorney's relationship with the organization. Thus, a wide degree of deference to Dunnick's decision to terminate plaintiff is appropriate when something occurs to disrupt that relationship and trust.

We conclude that, although plaintiff may have acted in the utmost good faith, she used poor judgment and did not take steps available to her that a reasonably prudent attorney would have taken prior to reporting what she suspected to be violations to the FDIC, thus destroying her effectiveness as counsel for the OSBC and its employees and especially with the organization's head, Frankie Dunnick. Her acts destroyed any effectiveness she could have with the organization in the future. The governmental interest here must prevail over any First Amendment rights that might be involved. Thus, the trial court did not err in granting summary judgment to the defendants on plaintiff's First Amendment claim.

### III. K.S.A. 1994 SUPP. 75-2973

K.S.A. 1994 Supp. 75-2973 provides in pertinent part as follows:

"(b) No supervisor or appointing authority of any state agency shall:
(1) Prohibit any employee of the agency from reporting any violation of state or federal law or rules and regulations to any person, agency or organization; or
(2) require any such employee to give notice to the supervisor or appointing authority prior to making any such report.
"(c) This section shall not be construed as:
. . . .
(4) prohibiting disciplinary action of an employee who discloses information which: (A) The employee knows to be false or which the employee discloses with reckless disregard for its truth or falsity, (B) the employee knows to be exempt from required disclosure under the open records act or (C) is confidential under any other provision of law."

The trial court found that no reasonable attorney in plaintiff's shoes could perceive the conduct of the defendants as the basis for an out-of-agency report at the time it was made. The court found

that plaintiff's report was made with reckless disregard for its truth or falsity and that she released information which was confidential under the Model Rules of Professional Conduct.

The trial court pointed out that plaintiff had only a second-hand knowledge of facts and did not conduct her own independent investigation of the facts and consideration of the law. For example, plaintiff never knew whether Stork had personally participated in the ongoing examination of the State Bank of Baileyville and did not know whether Stork had compromised that examination. She also did not know that Stork had closed her checking account with the State Bank of Baileyville. Moreover, the court stated, even by a cursory review of 18 U.S.C. § 213, the principle statute thought to be violated, there was no violation under *U.S. v. Napier*, 861 F.2d 547 (9th Cir. 1988), nor was the state statute, K.S.A. 9-1701(a), violated because Stork was not personally involved in examining a bank in which she had a financial interest. The trial court stated:

"Accordingly, as a matter of law, unless Mrs. Stork had in fact proximately examined any bank at which she or her husband had loans, or subsequently and proximately obtained loans, or had interfered in, or aided and abetted in such interference, or passed upon a matter in the examination of such a bank on a material matter as Deputy Commissioner, Mrs. Stork's position as Deputy Commissioner would not place her in violation of, or within the sanction of, any criminal or ethics statute cited by Ms. Crandon as a basis for her 'report'."

The trial court correctly determined that unless Stork had personally examined or been involved in any way in an examination of the two banks, Stork would not have violated the law. See *Napier*, 861 F.2d at 548. Stork's financial interest in the State Bank of Baileyville following her pretrial diversion would likewise not be in violation of law if she received prior approval. Plaintiff could have conducted a further investigation before making her report to the FDIC to determine whether Stork had in fact been involved in the examinations of the State Bank of Baileyville and the Southwest Bank and Trust, and she could have obtained information whether Stork had obtained approval for her financial interest in the State Bank of Baileyville despite her pretrial diversion.

K.S.A. 1994 Supp. 75-2973(c)(4)(A) does not require a person to make sure the conclusions to be drawn from information are true before making a disclosure. However, a person receives no statutory protection when he or she makes a disclosure with a reckless disregard for the truth or falsity of the disclosure made. An attorney, and especially the chief counsel, is held to a higher standard for the reasons set forth in section II. We affirm the trial court on this issue.

## IV. OTHER ISSUES

For the reasons stated in sections II and III, plaintiff's common-law claims cannot be sustained.

Other issues raised by the parties need not be addressed.

Affirmed.