The Honorable Don Steffes State Senator, 35th District State Capitol, Room 128-S Topeka, Kansas 66612-1504
The Honorable Paul Feleciano, Jr. State Senator, 28th District State Capitol, Room 452-E Topeka, Kansas 66612-1504
Dear Senators Steffes and Feleciano:
As Senator for the 35th District and Senator for the 28th District you ask our opinion concerning whether certain information submitted to the Office of the State Bank Commissioner by state chartered banks is confidential pursuant to K.S.A. 9-1712.
We have been provided the following information. Pursuant to K.S.A. 1997 Supp. 9-1715, the Commissioner has authority to issue special orders allowing state banks to engage in any activity in which such banks could engage were they operating as national banks. Federal chartered banks were previously allowed to form subsidiaries for purposes which are part of or incidental to banking. 12 C.F.R. § 5.34. In 1995 the Commissioner issued Special Order 1995-6 providing:
 "[A] Kansas state bank may own the stock of a subsidiary established and operated for the purpose of owning, holding, and managing all or part of the parent bank's securities portfolio."
The special order and the formation of subsidiaries pursuant thereto enables banks to realize a state tax advantage.
Pursuant to the special order, prior written notification was to be provided to the Commissioner of a bank's intent to establish and operate a subsidiary. The notification was required to include the following information:
 "IT IS FURTHER ORDERED, that the required notification shall detail the establishment and operation of the subsidiary, including without limitation, the proposed date of establishment of the subsidiary, the expected costs of establishment and operation of the subsidiary, the proposed name and location of the subsidiary, the staffing requirements of the subsidiary, and any additional information deemed necessary by the commissioner."
Counsel for the Commissioner, William Grant, has informed us that in no case did the Commissioner request additional information from any bank pursuant to this special order.
In 1996 the Commissioner issued Special Order 1996-4 broadening the authority of banks to form subsidiaries:
 "IT IS THEREFORE ORDERED, that subject to the limitations set forth in this special order, a Kansas state bank is hereby authorized to establish or acquire operating subsidiaries for the purpose of engaging in any activities which are a part of or incidental to the business of banking."
Again, approval of the Commissioner was not required; the special order provided for notification only. This time the only information required of all notifying banks was "the proposed activities of the operating subsidiary and the specific location at which each activity will be conducted." Again, the Commissioner retained the right to request additional information. We do not know if the Commissioner ever requested such additional information pursuant to Special Order 1996-4.
William Wolfe, Associate Director of the Legislative Research Department, at the direction of Senator Steffes, requested from the Commissioner:
 "[A] copy of the information required to be filed with the commissioner for each of the Kansas state chartered banks which have availed themselves of the authority granted by the two cited Special Orders [1995-6 and 1996-4]."
Mr. Grant, on behalf of the Commissioner, responded by denying the request, stating:
 "K.S.A. 9-1712 makes confidential the information this department gathers in investigating or examining the banks subject to OSBC [Office of the State Bank Commissioner] jurisdiction. This statute is interpreted to encompass any information that a bank is required to provide to the OSBC in pursuit of the department's regulatory responsibility. The information you have requested was prepared and placed in the OSBC custody for the express purpose of complying with Kansas law and this agency's supervisory authority. . . ."
Mr. Grant went on to state that K.S.A. 9-1712 allows the Commissioner discretion to disclose confidential information, and he requested additional information on the proposed use of the records.
We note that in response to a Freedom of Information Act request made by Mr. Wolfe, the Office of the Comptroller of Currency provided a list of national banks which had formed subsidiaries for the purpose of holding the banks' securities portfolios.
The Kansas Open Records Act (KORA) declares the public policy of the State to be that "public records shall be open for inspection by any person" and the KORA is to be "liberally construed and applied to promote such policy." K.S.A. 45-216(a). The effect of this statute is that all public records are open unless otherwise permissibly or mandatorily closed by law. "The burden of proving an exemption from disclosure is on the agency not disclosing the information." Southwest Anesthesia Service v. Southwest Medical Center, 23 Kan. App. 2d 950, 953 (1996).
K.S.A. 1997 45-221(a) sets forth exemptions from the KORA:
 "(a) Except to the extent disclosure is otherwise required by law, a public agency shall not be required to disclose:
 "(1) Records the disclosure of which is specifically prohibited or restricted by federal law, state statute or rule of the Kansas supreme court or the disclosure of which is prohibited or restricted pursuant to specific authorization of federal law, state statute or rule of the Kansas supreme court to restrict or prohibit disclosure."
K.S.A. 9-1712 provides for closure of certain information held by the Commissioner:
 "(a) All information the state bank commissioner generates in making an investigation or examination of a state bank or trust company shall be confidential information.
 "(b) All confidential information shall be the property of the state of Kansas and shall not be subject to disclosure except upon the written approval of the state bank commissioner.
 "(c) The commissioner shall give 10 days prior written notice of intent to disclose confidential information to the affected bank or trust company, except that, such confidential information shall not apply to reports filed pursuant to K.S.A. 9-2014, and amendments thereto.
 "(d) Any bank or trust company receiving notice as provided in subsection (c), may object to the disclosure of the confidential information and shall be afforded the right to a hearing in accordance with the provisions of the Kansas administrative procedure act.
 "(e) As used in this section, `information' means, but is not limited to, all documents, oral and written communication and all electronic data.
 "(f) Any person who violates this section, upon conviction, shall be guilty of a class C misdemeanor."
If the information requested is "confidential information" within the meaning of K.S.A. 9-1712, it is exempt from disclosure under KORA. If it is not "confidential information," disclosure is mandatory under KORA.
We recognize the general rule that an agency's interpretation of a statute which it has the duty to implement should be granted deference if the agency's interpretation is supported by a rational basis. However, an agency's interpretation is not binding, especially if the agency is mistaken as to a question of law. Radke Oil Company, Inc., v. Kansas Department of Health and Environment, 23 Kan. App. 2d 774, Syl ¶ 1 (1997).
K.S.A. 9-1712 makes it crime to release confidential information in violation of the statutory procedures. As a criminal statute, it is to be interpreted strictly. The interpretation placed on it by the Commissioner is a very broad one — "This statute is interpreted to encompass any information that a bank is required to provide to the OSBC in pursuit of the department's regulatory responsibility." Given the Commissioner's interpretation, even the names of state chartered banks could be deemed confidential since it is information supplied by the banks.
The Commissioner argues that legislative amendments to K.S.A. 9-1712
support his interpretation. Prior to 1990, K.S.A. 9-1712 provided:
 "All information which the commissioner shall gather or record in making an investigation or examination of any bank or trust company shall be confidential information and shall not be disclosed by the commissioner. . . ."
The minutes of the House Committee on Commercial and Financial Institutions contain the following written testimony of the then current counsel for the Commissioner:
 "The present statute does not adequately describe what confidential information is, who owns it and when it can be released. . . . The amendments also define information to be all inclusive." Minutes, House Committee on Commercial and Financial Institutions, Feb. 20, 1990.
We do not believe that counsel was saying that the purpose of the amendment was to close all information. Rather, he appears to have been referring to part of the amendments adding the following subsection to K.S.A. 9-1712:
 "(e) As used in this section, `information' means, but is not limited to, all documents, oral and written communication and all electronic data."
In other words, confidential information may take many forms. But what information is confidential is then defined by subsection (a) — that which is generated in making an investigation or examination.
We believe that the purpose of the 1990 amendment to K.S.A. 9-1712, which essentially changed the words "gather or record" to "generates," was an attempt to clarify that both information received from the bank and documents and reports prepared or created by the Commissioner as part of an examination or investigation are closed. See Crandon v. State,257 Kan. 727 (1995) (holding that both are protected.) We do not view the amendments to K.S.A. 9-1712 as an attempt to say that all information concerning state banks in the possession of or generated by the Bank Commissioner is confidential — the information still must be in relation to an investigation or examination of a bank. If the Legislature had intended for all information concerning state banks to be confidential, it could have easily said so.
The Commissioner concedes that this information is not from an examination. The Commissioner argues, however, that gathering this type of information is in the nature of an "investigation". The Commissioner relies on Atchison, T. S.F. Ry. Co. v. Kansas Com'n on Civil Rights,215 Kan. 911, 918 (1974), for the proposition that the word "investigation is appropriately used with regard to nonjudicial functions of an administrative agency and the seeking of information for future use rather than proceedings in which action is taken." This A.T.S.F case, however, did not concern the difference between a routine administrative function verses an in-depth review of information.
A more relevant definition of investigation is found in Baudin v. City of Crystal Lake, 548 N.E.2d 110 (Ill.App. 1989), in which a which a law enforcement agency attempted to close certain information under the Illinois information act as "records . . . related to the detection and investigation of crime." 548 N.E.2d at 1112. The court said,
 "An agency such as a police department cannot simply take the position that, since it is involved in investigatory work and some of its records are exempt from disclosure under the Act, every document in its possession somehow comes to share in that exemption. . . . Routine review of governmental functions is not sheltered, but when the inquiry departs from the routine and focuses with special intensity upon a particular party, an investigation is under way." Id. at 1113.
"Investigate" is generally defined as:
 "To follow up step by step by patient inquiry or observation. To trace or track; to search into; to examine and inquire into with care and accuracy; to find out by careful inquisition; examination; the taking of evidence; a legal inquiry." Black's Law Dictionary 825 (6th Ed. 1990).
We view the information required to be filed by the special orders as the product of a routine administrative function of the Commissioner, not as an investigation, because an investigation has a specific target from which detailed information is obtained. The one exception would be if the Commissioner required a bank to file additional information beyond the routine, that additional information might be closed as information generated from an investigation, depending on the nature and extent of the information.
This interpretation of the Commissioner's power to close investigatory materials is consistent with prior opinions of this office. In Attorney General Opinion No. 78-67, the Commissioner had argued that materials filed with a bank's initial application for incorporation were closed as gathered from an examination or investigation. The opinion said:
 "The confidentiality required by K.S.A. 9-1712
extends by the terms of that statute only to information derived by the commissioner from the examination and investigation of banks. That confidentiality applies, as General Ferguson stated, to the examination required by K.S.A. 9-804. It does not apply, however, to any information other than that derived from such examinations. The information contained in articles of incorporation and in the application for a certificate of authority is not furnished to the Commissioner as a result of any examination, but is expressly required to be furnished by the incorporators. The confidentiality requirement of K.S.A. 9-1712 may not be construed to thwart the plain requirements of K.S.A. 45-201 [the predecessor to KORA]."
In summary, given KORA's presumption of openness, and strictly construing K.S.A. 9-1712, we believe that the information required to be submitted from all banks notifying the Commissioner of subsidiaries is not from an "examination or investigation," and may not be closed under K.S.A.9-1712. We are unable to locate any other exception to the KORA which would allow closure of such information, so we believe it is mandatorily open under the KORA.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Steve Phillips Assistant Attorney General
CJS:JLM:SP:jm