No. 83,130

KANSAS PUBLIC EMPLOYEES RETIREMENT SYSTEM, *Appellant,* v. MICHAEL K. RUSSELL, *et al., Defendants,* and LINDE THOMSON LANGWORTHY KOHN & VAN DYKE, P.C., and THOMAS W. VAN DYKE, *Appellees.*

(5 P.3d 525)

Opinion filed April 28, 2000.

*Frank M. Rice,* of Schroer, Rice, P.A., of Topeka, argued the cause, and *Gene E. Schroer* and *Charles D. McAtee,* of the same firm; *Eugene I. Pavalon* and *Geoffrey L. Gifford,* of Pavalon, Gifford, Laatsch & Marino, of Chicago, Illinois; *Robert S. Atkins* and *Timothy K. McPike,* of Chicago, Illinois; *Robert F. Coleman, Eugene J. Schiltz,* and *Kenneth Philip Ross,* of Robert F. Coleman & Associates, of Chicago, Illinois; *Robin R. LaFollette* and *James L. Ungerer,* of Shawnee Mission; *Arthur T. Susman* and *Robert E. Williams,* of Susman & Watkins, of Chicago, Illinois; and *Terry Rose Saunders,* of Law Offices of Terry Rose Saunders, of Chicago, Illinois, were with him on the briefs for appellant.

*R. Frederick Walters,* of Walters Bender & Strohbehn, P.C., of Kansas City, Missouri, argued the cause, and *Karen Wedel Renwick* and *Connie M. Francis,* of the same firm, were with him on the brief for appellees.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The Kansas Public Employees Retirement System (KPERS) appeals from the district court's entry of final judgment as to all claims against defendants Linde Thomson Lang-

worthy Kohn & Van Dyke, P.C., (Linde Thomson) and Thomas W. Van Dyke (who will be included in references to the Linde Thomson defendants). The district court granted summary judgment in favor of the Linde Thomson defendants. The district court certified its orders concerning the Linde Thomson defendants as final under K.S.A. 1999 Supp. 60-254(b). KPERS appealed. The appeal was transferred from the Court of Appeals to this court on the motion of KPERS, pursuant to K.S.A. 20-3017.

KPERS sought damages for its investment losses in Emblem Graphic Systems, Inc., (Emblem) a wholly owned subsidiary of ETL Corp. (ETL). The action was filed in 1993 against numerous defendants; however, this appeal involves only KPERS's claims against the Linde Thomson defendants.

KPERS alleged that the Linde Thomson defendants knowingly participated and assisted Michael K. Russell in misappropriating KPERS funds and using them for his personal benefit while he was a KPERS trustee. KPERS also alleged that the Linde Thomson defendants participated and assisted Reimer & Koger Associates, Inc., (R&K) in breaching its fiduciary duty to KPERS. The district court concluded that the Linde Thomson defendants were released from these claims by the terms of a release agreement. The district court further concluded that, if not indemnified by the release agreement, the Linde Thomson defendants were not liable under the facts of this case for assisting any breaches of trust by Russell or R&K.

In granting summary judgment in favor of the Linde Thomson defendants and against KPERS, the district court made extensive findings of fact. On appeal, KPERS included a lengthy statement of facts in its brief, but it did not specify any of the trial court's findings as contested. It is settled that unappealed determinations of fact are final and conclusive. *Justice v. Board of Wyandotte County Comm'rs*, 17 Kan. App. 2d 102, 109, 835 P.2d 692, *rev. denied* 251 Kan. 938 (1992).

The district court made the following findings of fact: Plaintiff KPERS is an instrumentality of the State of Kansas that manages the Kansas public employees' retirement fund. It is governed by a board of seven trustees, who are appointed by the Governor for

overlapping 4-year terms. KPERS trustees are authorized to consult with advisors regarding the management of the funds and investments.

Defendant R&K had a well-established business relationship with KPERS. In 1973, R&K began serving KPERS as an investment manager for some publicly traded investments. In 1975, R&K and KPERS entered into an "Investment Counselor Agreement." In 1985, the parties supplemented the existing contract with a "Special Investment Advisory Services Agreement," which authorized R&K to make investments.

Linde Thomson was a law firm with attorneys practicing in the states of Missouri and Kansas. Van Dyke was an attorney with Linde Thomson. The Linde Thomson defendants represented R&K as general counsel from 1973 until 1991. In that capacity, the Linde Thomson defendants negotiated and drafted the 1985 investment services contract between R&K and KPERS.

Defendant Michael K. Russell was a KPERS trustee from 1983 to 1987. He was chairman of the KPERS board of trustees from August 1985 to July 1987. Linde Thomson represented Russell from the late 1970's to at least 1987.

Emblem Tape and Label Co. (Emblem Tape) designed, manufactured, and marketed graphics specialty products, including pressure sensitive labels, business forms, and specialty packaging products. The business had offices and production facilities in Kansas City, Kansas, and Denver, Colorado. In December 1982, ETL was organized for the purpose of acquiring all of the common stock of Emblem Tape, and in January 1983 it did so. ETL continued to operate the business through Emblem, its wholly owned subsidiary. Emblem's sales for fiscal year 1984 were nearly $7 million.

The following persons formed ETL's board of directors:

Tom W. Olofson
Jerry L. Haney
G. Kenneth Baum (defendant)
Dennis L. O'Hara
Michael K. Russell (defendant)
William D. Thomas (defendant)

Thomas W. Van Dyke (defendant)
Frank L. Victor (defendant)

Only O'Hara, among the directors, was not a shareholder. ETL shareholders and the percentage of outstanding common stock each owned were:

| | |
|---|---|
| Olofson | 52% |
| Haney | 33% |
| Baum | 3% |
| Russell | 3% |
| Thomas | 3% |
| Van Dyke | 3% |
| Victor | 3% |

Russell resigned as a director of ETL on September 12, 1985. At that time he was paid $48,330 for the ETL stock he had purchased in January 1983 for $16,500.

Baum and Thomas were officers and directors of Baum & Co., which provided investment banking and consulting services to assist Emblem in obtaining financing.

Van Dyke, in addition to being a director and shareholder of ETL, served as an officer and legal counsel of ETL and Emblem from 1983 into 1989.

In January 1985, Emblem borrowed $900,000 from Johnson County Bank. As a condition of the loan, the following shareholders gave limited guarantees:

| | | |
|---|---|---|
| Olofson | 16.67% | maximum of $150,000 principal |
| Haney | 16.67% | $150,000 |
| Russell | 22.22% | $200,000 |
| Van Dyke | 22.22% | $200,000 |
| Thomas | 11.11% | $100,000 |
| Victor | 11.11% | $100,000 |
| | 100.00% | $900,000 |

On January 18, 1985, ETL directors authorized the issuance of warrants in amounts equal to 1,500 shares of common stock for each $100,000 guaranteed by the shareholders at an exercise price of $5.50.

In 1985, Koger of R&K conferred with Thomas of Baum & Co. about investment opportunities for KPERS money. Thomas mentioned Emblem to Koger. R&K asked Russell for his opinion of Emblem's management. Russell's reply was generally favorable.

A memorandum dated August 13, 1985, which was produced by Baum & Co. and distributed to R&K, identified Russell as an Emblem director and shareholder and stated that his stock warrants would be canceled in exchange for cash upon completion of the KPERS (loan) investment.

Russell had no knowledge of a potential KPERS investment in Emblem until late August or early September 1985. He resigned as an ETL director effective September 12, 1985. On September 16, 1985, the ETL board accepted his resignation, authorized repurchase of his stock and warrants upon execution of the loan agreements with KPERS, and extinguished his loan guarantees. The repurchase price of $16.11 per share was established by a formula in the "Stock Redemption Agreement," which had most recently been amended in June 1985. The purchase price for Russell's 3,000 shares was $48,330. He negotiated a 3-year note with annual 10% interest in lieu of cash. Emblem made only one interest payment to Russell before paying the note early, in February 1987, after Russell's interest in the company was publicized in a newspaper account.

On September 30, 1985, on behalf of the Kansas Debt Fund (KDF), a nominee of KPERS, R&K invested $5,292,000 in Emblem. The investment was in the form of a $2.5 million subordinated debenture, a $2.9 million secured note, and warrants to purchase 32,835 shares of ETL common stock. Linde Thomson represented Emblem in connection with this initial KPERS loan. It was during the same period that the Linde Thomson defendants negotiated for R&K the contract with KPERS that authorized R&K to make investments.

In 1987 and 1988, KPERS loaned substantial additional amounts (approximately $1.5 million) to Emblem in exchange for preferred stock. At that time KPERS also exchanged debentures from the 1985 loan for preferred stock. For the 1987 and 1988 transactions, Linde Thomson provided legal advice and representation to Em-

blem on an "as requested" basis by the officers and directors. Linde Thomson did not provide legal advice to R&K or KPERS in connection with the 1987 or 1988 loans.

In December 1988, California Labels, Inc., (Cal Labels) agreed to purchase the assets of Emblem. The parties to the agreement were Cal Labels, Emblem, Olofson, Haney, and Merchants Bank, which was a principal creditor of Emblem, Olofson, and Haney.

Paragraph 10(d) of the Asset Purchase Agreement stated: "KDF, Merchants, Olofson and Haney shall execute releases for any and all claims, damages and liabilities arising out of the operations of Emblem and the relationship of the parties with Emblem and each other prior to the Closing." The release, which was executed contemporaneously with the Asset Purchase Agreement, provides:

"1. Release and Covenant Not to Sue. KDF and the Investors hereby release, remit, and forever discharge each of the other parties to this agreement together with any officers, directors, partners, stockholders, employees, principals, agents, counsel, subsidiaries, or controlling persons of the foregoing, together with their heirs, legatees, devisees and personal representatives, (all such affiliated persons being referred to collectively as the 'Indemnified Persons'), from any and all claims, demands, liabilities, obligations, losses, damages and causes of action, whether known or unknown, based on, arising out of, or directly or indirectly relating to either (i) the business, management or operation of the Emblem or ETL Corp.[;] (ii) the sale, purchase, ownership, exchange or pledge of any of the securities or debt obligations of Emblem or ETL Corp.; (iii) any action taken by any party or Indemnified Person in its or his capacity as a shareholder, creditor, officer or director of Emblem or ETL; (iv) any personal guarantee of any indebtedness of Emblem or ETL; or (v) any prior negotiations, representations, understandings, agreements, discussions or dealings among any of the parties hereto or other Indemnified Parties (the transactions described in clauses (i) through (v) being collectively referred to as the 'Transactions'). The release granted to any party in the foregoing sentence shall be conditioned upon the closing of the sale contemplated under the Purchase Agreement and the performance by the released party of its obligations under the Agreement. The parties further represent, covenant and warrant that, they have not commenced or prosecuted, nor will any of them commence or prosecute, any form of action or proceeding against any party or any Indemnified Person, based on, arising out of, or directly or indirectly relating to the Transactions."

"During the course of the sale," Linde Thomson disclosed that at times it had represented Olofson, Haney, R&K, and MBI Ventures, a partnership with Merchants Bank as its general partner.

MBI Ventures loaned the money to purchase Emblem. Linde Thomson did not represent Olofson, Haney, R&K, KDF, Merchants Bank, or MBI Ventures "in the transactions contemplated by the asset purchase agreement or the MBI financing." Olofson and Haney were represented in the sale of Emblem, including the preparation and execution of the release, by Joel Pelofsky of the Shughart, Thomson & Kilroy law firm.

When KPERS filed this action in 1993, seeking to recover its investment losses in Emblem, the Linde Thomson defendants raised the release agreement in defense. The trial court determined that KPERS's claims against the Linde Thomson defendants were barred by the release and entered summary judgment in their favor.

KPERS appeals the granting of summary judgment to Linde Thomson, raising the following issues:

1. Did KPERS release its claims against the Linde Thomson defendants?

2. Did the district court erroneously conclude as a matter of law that the Linde Thomson defendants did not participate in breaches of trust committed by Michael Russell and R&K?

We need to address only the first issue. When the assets of Emblem were transferred to Cal Labels in December 1988, the asset purchase agreement required KDF, Merchants Bank, Olofson, and Haney to execute releases for any and all claims, damages, and liabilities arising out of the operations of Emblem and the relationship of the parties with Emblem and each other prior to the closing.

The release agreement names KDF, Olofson, Haney, and T&J Investment Co. as the parties to the agreement. It provides that the parties release each other. In addition, they release "any officers, directors, partners, stockholders, employees, principals, agents, counsel, subsidiaries, or controlling persons of the foregoing, together with their heirs, legatees, devisees and personal representatives [(Indemnified Persons)]."

The release agreement specifies that the parties and other indemnified persons are protected from

"any and all claims, demands, liabilities, obligations, losses, damages and causes of action, whether known or unknown, based on, arising out of, or directly or indirectly relating to either (i) the business, management or operation of the Emblem or ETL Corp.[;] (ii) the sale, purchase, ownership, exchange or pledge of any of the securities or debt obligations of Emblem or ETL Corp.; (iii) any action taken by any party or Indemnified Person in its or his capacity as a shareholder, creditor, officer or director of Emblem or ETL; (iv) any personal guarantee of any indebtedness of Emblem or ETL; or (v) any prior negotiations, representations, understandings, agreements, discussions or dealings among any of the parties hereto or other Indemnified Parties . . . ."

Based on the release, the Linde Thomson defendants and KPERS filed cross-motions for summary judgment. The district court granted the motion of the Linde Thomson defendants.

KPERS contended that the Linde Thomson defendants were not indemnified because they were not acting as counsel for any of the parties to the release agreement *at the time it was executed.* According to the district court,

"[i]t is undisputed that Linde Thomson and Van Dyke acted as counsel for Olofson and Haney at various points in time. In the later part of 1987 or first of 1988, Reimer & Koger were instituting changes at Emblem, including a new management team. The changes and negotiations caused Olofson and Haney to decide that Van Dyke could no longer serve as their counsel so they retained Joe Pelofsky, an attorney with Shughart Thomson & Kilroy. Pelofsky represented Olofson and Haney at the time the asset purchase agreement and release were signed."

In rejecting KPERS's argument, the district court first reasoned that the release did not limit indemnified persons to current officers, directors, counsel, and so on. In addition, the release expressly included prior representations and dealings among the indemnified transactions. Moreover, the district court observed:

"The 'any and all' language makes the Release very broad; the Release is not limited to a release of the 'Indemnified Person' in the capacity in which they become an 'Indemnified Person.' In other words, the language of the release does not release the Linde Thomson Defendants for only those claims arising against them as Olofson and Haney's attorneys. In fact, subparagraph (iii) broadens the release beyond actions which may have been performed in the capacity of 'counsel' to include actions Van Dyke may have taken as a 'shareholder, creditor, officer or director of Emblem.' "

Finally, the district court compared the claims made by KPERS against the Linde Thomson defendants with the categories of

claims released under the release agreement. KPERS alleged that the Linde Thomson defendants participated in and assisted Russell and R&K in breaching their fiduciary obligations to KPERS. The district court concluded that those claims fall within subparagraphs (i) through (v) of the release agreement.

Paragraph 10(d) of the Asset Purchase Agreement made sale of the assets of Emblem to Cal Labels contingent upon executing the mutual release agreement for all potential "claims . . . arising out of the operations of Emblem and the relationship of the parties with Emblem and each other prior to the Closing." The release agreement further described the claims to be released and identified who would be released. The two agreements were executed together and as part of the same transaction; as such, the district court properly construed the two agreements together in reaching its decision. See *Akandas, Inc. v. Klippel,* 250 Kan. 458, Syl. ¶ 10, 827 P.2d 37 (1992).

On appeal, KPERS contends that the district court ignored the fundamental rule that "[a] release should be construed from the standpoint of the parties at the time of its execution, and in the light of their relations and their situation at the time when it was formulated, and of the circumstances which surrounded the transaction." 76 C.J.S., Release § 44, p. 584. What KPERS ignores, however, is that the district court considered the language of the release to be unambiguous, hence, not subject to construction. KPERS also ignores that it drafted the release agreement and failed to expressly limit the release to present parties and counsel.

The same rules that apply to the construction of contracts and written instruments apply to a release agreement. If the language of the instrument is unambiguous, there is no room for rules of construction. *In re Cherokee County Revenue Bonds,* 262 Kan. 941, 953, 946 P.2d 83 (1997). We are not bound by the district court's construction of the agreement. The construction of a written instrument is a question of law, and the instrument may be construed and its legal effect determined by an appellate court. 250 Kan. 458, Syl. ¶ 1. However, we agree with the district court that there is no need for interpretation of the language of the release agreement as it applies to KPERS's claims against the Linde

Thomson defendants. As the district court observed, by the express language of the release agreement, counsel rather than present counsel were included among indemnified persons and prior representations and dealings were included among the indemnified transactions. As the district court also observed, the express language of the release agreement includes the claims made by KPERS against the Linde Thomson defendants and indemnification of Van Dyke in his several roles.

KPERS also argues that the district court erroneously failed to place the burden of proof regarding the effect of the release agreement on the Linde Thomson defendants. The legal effect of the written agreement, however, is a question of law that the district court properly decided on summary judgment. The decision rested solely on the language of the agreement; proof of facts was not involved.

In view of our determination that KPERS released its claims against the defendants, we need not consider the second issue raised by KPERS.

The judgment of the district court is affirmed.