No. 87,044

KANSAS PUBLIC EMPLOYEES RETIREMENT SYSTEM, *Appellant*,
v. KUTAK ROCK, *Appellee*.

(44 P.3d 407)

Opinion filed
April 19, 2002.

*Frank M. Rice*, of Schroer Rice P.A., of Topeka, argued the cause, and *Gene E. Schroer*, of the same firm; *Eugene I. Pavalon* and *Geoffrey L. Gifford*, of Pavalon, Gifford, Laatsch & Marino, of Chicago; *Robert F. Coleman* and *Eugene J. Schiltz*, of Robert F. Coleman & Associates, of Chicago; and *George W. Spellmire* and *Denise A. Johnson*, of D'Ancona & Pflaum LLC, of Chicago, were with him on the briefs for appellant.

*Russell S. Jones, Jr.*, of Shughart Thomson & Kilroy, P.C., of Kansas City, argued the cause, and *R. Lawrence Ward* and *Kurt D. Tilton*, of the same firm, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The Kansas Public Employees Retirement System (KPERS) sought damages from the law firm of Kutak Rock for losses from investments in Sharoff Food Service, Inc. The district court granted summary judgment in favor of Kutak Rock. KPERS appeals. The case was transferred from the Court of Appeals on KPERS's motion. K.S.A. 20-3017.

The issue raised on appeal is whether the district court erred in entering summary judgment in favor of Kutak Rock on (1) KPERS's claims for breach of contract and professional negligence and (2) KPERS's claim for participation in a breach of trust.

This is one of several actions prosecuted by KPERS seeking damages for its investment losses and the fifth appeal to come to this court. This action pertains to KPERS's investment in Sharoff Food Service, Inc. (Sharoff), a food service and distribution company located in Denver, which eventually sought bankruptcy and ceased doing business in June 1989. Kutak Rock was named as one of a number of defendants in KPERS's first amended petition in the district court's Case No. 92 CV 805. The allegations against Kutak Rock are for professional negligence and breach of contractual and fiduciary duties and participation with Reimer & Koger Associates, Inc. R & K in a breach of trust. This appeal involves only KPERS's claims against Kutak Rock.

KPERS alleged that Kutak Rock, which had been hired by R & K to help with KPERS's investment in Sharoff, failed to perform duties owed to KPERS, including advising KPERS about the investment and compliance with investment guidelines and statutory requirements. KPERS also alleged that Kutak Rock participated in R & K's breach of statutory and fiduciary duties to KPERS.

In granting summary judgment in favor of Kutak Rock and against KPERS, the district court made extensive findings of fact. On appeal, KPERS included a lengthy statement of facts in its brief, but it did not specify any of the trial court's findings as contested. It is settled that unappealed determinations of fact are final and conclusive. *KPERS v. Russell*, 269 Kan. 228, 229, 5 P.3d 525 (2000).

The following narrative statement of facts is based on the findings of fact in the district court's memorandum decision and order regarding Kutak Rock's motion for summary judgment. Introducing its findings of fact, the district court stated that they "reflect either: (1) facts which are not controverted by the parties or (2) controverted facts as construed in the light most favorable to KPERS as the party opposing the summary judgment."

Plaintiff KPERS is an instrumentality of the State of Kansas that manages the Kansas public employees' retirement fund. It is governed by a board of seven trustees, who are appointed by the Governor for overlapping 4-year terms. KPERS trustees establish investment policies. They are authorized to consult with advisors regarding the management of the funds and investments.

In 1973, R & K began serving KPERS as an investment manager for some publicly traded investments. In 1975, R & K and KPERS entered into an "Investment Counselor Agreement." In 1985, the parties supplemented the existing contract with a "Special Investment Advisory Services Agreement," which authorized R & K to make investments.

Sharoff was a Denver, Colorado, food service and distribution company. It sought capital for expanding its business and acquiring a competitor, W. T. Stevenson and Company, Inc. R & K determined that Sharoff was a prudent and appropriate investment opportunity for KPERS and recommended that KPERS make an investment. On behalf of the Kansas Debt Fund (KDF), a nominee of KPERS, R & K invested $6.38 million in Sharoff on June 3, 1987.

In preparing for the Sharoff investment, R & K contacted the Denver office of Kutak Rock law firm. Kutak Rock's engagement letter to R & K stated that Kutak Rock would act as counsel to R & K, as agent for the investors who proposed to invest in Sharoff. The letter stated:

"We [Kutak Rock] will perform all services customarily performed by counsel in domestic transactions of the nature contemplated herein, including among other services, the drafting, negotiating and preparation of a preliminary agreement, or commitment letter, outlining the basic terms of the investment and a definitive agreement for the purchase by Reimer and Koger, on behalf of the

Investors, of subordinated Debentures, shares of Preferred Stock and Warrants to purchase Common Stock, of Sharoff, as well as all other documents necessary to effect the investment. In addition, we will perform such due diligence inquiries and activities as may be required by the investors· in connection with its investment. We further understand that we may be called upon to render corporate, securities and tax advice in structuring the transaction."

Edward Hart of R & K executed the engagement letter on behalf of R & K. In his deposition, Hart testified that the agreement was that Kutak Rock would prepare documents for the transaction. Asked what due diligence consisted of as the phrase was used in the commitment letter, Hart answered: "Assuming as the agent for the investors at that particular point in time I would have requested they determine that Sharoff was in legal standing in the State of Colorado."

Hart also testified that he did not intend for Kutak Rock to do any financial due diligence. Instead, any due diligence expected of Kutak Rock would be related to reviewing articles of incorporation, bylaws, minutes of board meetings, and verifying that the corporation was in good standing.

Asked whether it was his intent that Kutak Rock make a determination for R & K whether the investment was prudent, Hart testified that, to the best of his recollection, he did not. Asked whether it was his intent that Kutak Rock provide R & K with an opinion as to whether R & K was authorized to make the investment in Sharoff on behalf of KDF, Hart testified that, to the best of his recollection, he did not.

Kutak Rock was never asked by anyone at R & K to review R & K's due diligence, and Kutak Rock never did so. Kutak Rock was never asked to negotiate the business or investment terms of the Sharoff transaction, and Kutak Rock never did so. The due diligence investigation of Sharoff that was performed by R & K was in progress or completed by the time Kutak Rock was engaged.

Kutak Rock drafted a commitment letter, performed a due diligence investigation, and drafted the documents necessary to close the investment and acquire an ownership interest. The categories of the checklist include corporate records, governmental filings and disclosure documents, financing documents and correspondence,

material agreements, and miscellaneous. In the miscellaneous category are documents on employee benefits, a schedule of litigation and government proceedings, correspondence with accountants and lawyers, judgments and consent decrees, company or industry investment analyses, appraisals, Dun & Bradstreet Report, financial statements, and any other information relevant to the financial condition of the company.

Kutak Rock associate Michelle Keist was primarily responsible for collecting information pursuant to the due diligence checklist. Kevin Cudney was the Kutak Rock attorney primarily responsible for maintaining contact with R & K on the transaction.

Kutak Rock prepared a due diligence report and submitted it to Hart. The district court found:

"The due diligence report, among other things, reported that records of Sharoff were not readily accessible or well organized, that minutes of board of directors meetings were missing, and that there were significant gaps in Sharoff's financial reports. The report also detailed material financial obligations, litigation, transactions with affiliates, account payables, employment issues relating to union employees, salaries of key employees, equity agreements, and shareholders agreements."

After discussing the due diligence report with Hart, Cudney prepared the following memorandum to the file:

"On Thursday afternoon, May 28, 1987, I had a brief telephone conversation with Edward Hart of Reimer and Koger Associates, Inc. in connection with the captioned transaction regarding our 'due diligence' report . . . .

"I asked Mr. Hart if the report contained any 'surprises,' or other matters which he believed we should investigate further. I specifically mentioned the lease arrangements between Sharoff and Platte River Partnership, the general partners of which are affiliates of Sharoff. Mr. Hart responded that he was aware of the relationship and the lease transaction and that it did not trouble him. He stated only that he would like us to review the partnership agreement for Platte River, but that he had no further questions or comments on the report.

"I next stated that our 'due diligence' investigation was necessarily rushed by the aggressive scheduling of the transaction. Mr. Hart responded that he was aware of the problem. But believed that he and his associate, Mr. Crew, were quite familiar with the affairs of Sharoff and were relying more on their investigation than our due diligence efforts."

R & K made the decision to invest in Sharoff. Kutak Rock prepared the documents necessary to effect R & K's investment de-

cision. The closing memorandum for the transaction identified the purchaser as "K.D.F., a Kansas nominee general partnership," and the "Counsel to Purchaser" as Kutak Rock.

Cudney's opinion of Hart and Bob Crew of R & K, throughout the transactions, was that they were competent, sophisticated investment advisors.

On appeal, KPERS states that its breach of contract and professional negligence theory of liability against Kutak Rock is that, even though Kutak Rock was aware of facts indicating that the Sharoff investment did not comply with the Kansas statute governing investment of KPERS's trust funds, it went ahead and provided the due diligence and transactional services necessary to completion of the investment. The statute is K.S.A. 74-4921(4) (Ensley 1985), which provides:

"(a) In investing and reinvesting moneys in the fund and in acquiring, retaining, managing and disposing of investments of the fund there shall be exercised the judgment and care under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital. Within the limitations of the foregoing standard and subject to clause (b) of this subsection, there may be acquired, retained, managed and disposed of as investments of the fund every kind of investment which men of prudence, discretion and intelligence acquire, retain, manage and dispose of for their own account."

In other words, prudence is the statutory standard that governs investment of KPERS funds. KPERS's claim is that Kutak Rock provided services necessary to completion of the Sharoff investment transaction in spite of its being aware of facts indicating that the investment was not prudent. KPERS's statement of its claim does not identify contractual provisions or duties owed by Kutak Rock.

The district court concluded that Kutak Rock did not owe KPERS a duty to determine that the Sharoff investment was not a prudent one. The district court examined allegations of both contractual and tort duty and concluded that neither existed in the circumstances of this case.

With regard to a contractual provision, the district court examined Kutak Rock's engagement letter to R & K and noted that in the letter Kutak Rock agreed to "perform 'due diligence as the Investors may require.' " The district court found that the nature of the due diligence is not further specified so that the provision is ambiguous. The district court, therefore, examined parole evidence as to the intent of Cudney and Hart, who executed the engagement letter. The district court found that the "evidence is undisputed and establishes that Mr. Hart expected Kutak Rock to determine that Sharoff was a corporation in good standing. There is no evidence that an express agreement was made that Kutak Rock would perform any other due diligence or that it would perform any due diligence related to Stevenson." "Hence," the district court concluded, "there was no agreement as to the terms KPERS seeks to read into the contract."

On appeal, KPERS's position seems to be that summary judgment on its breach of contract claim was improper because there is a factual dispute whether Kutak Rock agreed to examine the investment's compliance with Kansas law. As already noted, however, KPERS has not specified any of the trial court's findings as contested.

With regard to a professional duty implied in law, the district court stated: "Since the record is undisputed that Kutak Rock performed the due diligence agreed to by the contracting parties and issued a report, the question is whether Kutak Rock met the standard of care in performing this obligation." The district court systematically analyzed the professional negligence claim according to the list of elements set out in *Phillips v. Carson*, 240 Kan. 462, 476, 731 P.2d 820 (1987): "(1) the existence of an attorney-client relationship giving rise to a duty; (2) a breach of that duty by an act or omission of the attorney; (3) actual damages . . . sustained by the client; and (4) a proximate cause relationship between the damage and the attorney's breach of duty."

(1) Attorney-client relationship. The memorandum of closing prepared by Kutak Rock identified the purchaser as K.D.F. and Kutak Rock as the attorney for the purchaser. For purposes of summary judgment, therefore, the district court assumed that an

attorney-client relationship existed between KPERS and Kutak Rock. On appeal, Kutak Rock asserts that it had no attorney-client relationship with KPERS, but fails to address its designating itself as K.D.F attorney in the closing documents.

(2) Breach of duty. KPERS alleged that Kutak Rock breached its duty by failing to

"(a) advise, counsel and assist Reimer & Koger regarding the contractually mandated requirements of prudence in KPERS' investments; (b) advise KPERS' Board of the unlawful and imprudent investment of KPERS' funds; (c) guard against and advise the KPERS' Board of the negligence and breach of fiduciary duties of the Reimer and Koger Defendants; (d) perform adequate due diligence reviews of Sharoff and its records on behalf of KPERS in connection with KPERS' Initial Investment; and (e) examine the facts and circumstances to ensure that KPERS' Initial Investment in Sharoff was prudent as required by Kansas law."

According to the district court, "[t]he essence of these allegations is that Kutak Rock failed to determine or advise KPERS that the investment in Sharoff was an imprudent and, therefore, illegal investment."

The question of breach, as framed by the district court, was

"whether outside counsel representing KPERS, a public employee trust, had a duty to determine whether a particular investment (Sharoff) complied with the KPERS' prudent investment statute and guidelines and upon completion of that investigation report the results directly to the KPERS' trustees rather than to the agent of KPERS who was performing financial due diligence and to whom KPERS had delegated the authority to make the investment?"

It may be noted that this statement of the issue leaves out part (a) of KPERS's allegations, which is that Kutak Rock failed to advise R & K of financially questionable aspects of Sharoff's operation. The district court expressly found that Cudney discussed the Kutak Rock due diligence report, including specific findings regarding a lease transaction, with Hart of R & K and was assured that R & K was very familiar with Sharoff's affairs and was relying more on its own investigation than on Kutak Rock's efforts. For this reason, it was not included in the question of law.

One facet of the duty question, as stated by the district court, is whether Kutak Rock had a duty to determine whether the proposed investment in Sharoff was a prudent one. The district court

concluded that "[n]o duty exists requiring an attorney to advise a client regarding the advisability of an investment."

The district court quoted the standard articulated with regard to the liability of an accountant to a trust in *Gillespie v. Seymour*, 19 Kan. App. 2d 754, 876 P.2d 193, *rev. denied* 255 Kan. 1001 (1994). The Court of Appeals stated:

"There is no independent duty of an accountant to say no to a client who has decided on a noncriminal financial course of action and does not ask the accountant's advice. This is true even if the accountant does not think the course of action is a good idea and another of the accountant's clients might benefit by it." 19 Kan. App. 2d at 770.

In addition to its reliance on *Gillespie*, the district court cited cases from New Jersey and New York. *Lamb v. Barbour*, 188 N.J. Super 6, 455 A.2d 1122 (1982); *Vitale v. Coyne Realty, Inc.*, 414 N.Y.S.2d 388, 66 App. Div. 2d 562 (1979). In concluding its reasoning, the district court turned to commentators:

"In summarizing such cases, authors of a leading treatise on legal malpractice stated that an attorney does not have 'an omnipresent responsibility to ferret out all possible problems as "trustee" of the client's interests. Nor does a lawyer have an ombudsmen responsibility to protect the client from his or her own limited business expertise.' R. Mallen & J. Smith, Legal Malpractice § 8.2, at 560 (4th ed. 1996). See *Resolution Trust Corp. v. Blasdell*, 154 F.R.D. 675 (D. Ariz. 1993)."

Having concluded that Kutak Rock did not owe a duty to KPERS to determine whether the Sharoff investment was prudent, the district court did not consider questions of damages or proximate cause.

In its memorandum decision, the district court also rejected KPERS's additional claims that Kutak Rock had a duty to ensure an independent financial analysis and a duty to ensure that information was communicated to the client. The district court reasoned that each of the additional alleged duties would involve Kutak Rock's determining whether the Sharoff investment was prudent, which it had no duty to do.

The existence of a legal duty is a question of law over which this court exercises unlimited review. *Glassman v. Costello*, 267 Kan. 509, 521, 986 P. 2d 1050 (1999).

On appeal, KPERS fails to distinguish between duty and breach of duty. KPERS cites *Crandon v. State*, 257 Kan. 727, 742, 897 P.2d 92 (1995), for the principle that the attorney for an organization has a "responsibility to give advice when necessary to prevent or rectify unlawful or improper acts of the organization and its employees." The court's statement in *Crandon* was not a formulation of duty for a law firm. It was an illustration of the necessity of a close and trusting relationship between an organization and its counsel. The illustration was part of the court's reasoning why deference was owed to the organization's decision to terminate employment of the general counsel for the Office of the State Banking Commissioner after counsel disrupted the relationship of mutual trust by going to the FDIC with alleged violations of law by a deputy commissioner.

Cases cited by the district court shed more light on the issue at hand. In *Resolution Trust Corp v. Blasdell*, 154 F.R.D. 675 (D. Ariz. 1993), the trial court dismissed and entered judgment against Resolution Trust Corporation (RTC) on its various claims against the law firm, Jennings Strouss & Salmon (Jennings Strouss), that had performed legal services for Sentinel Savings & Loan Association (Sentinel), an insolvent savings and loan institution. The RTC's claims against the law firm fell into two categories—unspecified loan transactions and the Indian School transaction. The court dismissed all claims based on unspecified loan transactions for lack of specific facts regarding the law firm's alleged misconduct. 154 F.R.D. at 685. The court entered judgment in favor of the law firm on claims based on the Indian School transaction, which violated regulations. The court rejected RTC's allegation that the law firm had a duty to investigate and advise Sentinel regarding regulatory violations. The law firm's representation of Sentinel was substantial, resulting in the law firm's receiving more than $1 million in fees from Sentinel in 5 years for performing the following services:

"prepared standardized loan forms for Sentinel, advised Sentinel regarding the duties and liabilities of directors and officers of financial institutions, represented Sentinel on 9 of the 11 loans which are the target of RTC's Complaint in this action, prepared proxy statements for Sentinel, worked on a subsequent public

offering of Sentinel stock, advised Sentinel regarding potential expansion in California, represented Sentinel in loan workouts and foreclosures, represented Sentinel in other types of litigation, and advised Sentinel regarding a variety of regulatory issues and interfaced with the regulators on Sentinel's behalf." 154 F.R.D. at 685.

The RTC case and the present case are similar in material ways. Jennings Strouss provided typical legal services for Sentinel, and Kutak Rock provided typical legal services for KPERS. The RTC case, though, involved circumstances seemingly much more likely to give rise to a duty than the circumstances of the KPERS case. Jennings Strouss' representation of Sentinel was direct, certainly not confined to one transaction, quite comprehensive in range, and even included advising Sentinel regarding a variety of regulatory issues. Nonetheless, the federal district court rejected RTC's allegation that the law firm had a duty to investigate and advise Sentinel regarding regulatory violations in a particular transaction. 154 F.R.D. at 685. Kutak Rock's representation of KPERS, in contrast, was not direct, was confined to one transaction, was not at all comprehensive in range, and did not include advising KPERS regarding the financial advisability of transactions other than the Sharoff investment.

The key to the RTC decision is that the scope of the law firm's duty was delimited by the client's express request for services. Hence, even though Jennings Strouss had advised Sentinel regarding regulatory issues on some transactions, Jennings Strouss did not have a duty to advise Sentinel of Loans-to-One-Borrower regulations that might be violated by the Indian School transaction because Sentinel did not ask the law firm to do so. And, in the regular course of documenting the transaction, the law firm did not obtain information necessary to formulate the advice. On this topic, the court stated:

"With respect to the Indian School transaction, . . . Sentinel only asked Jennings Strouss to document the loan and did not 'instruct, pay, authorize, or give Jennings Strouss information sufficient to determine whether Sentinel had complied with the loans to one borrower regulations with regard to the borrower or some potential assignee.' . . .

"Jennings Strouss . . . correctly advised Sentinel regarding the Loans to One Borrower regulations and . . . Sentinel chose to handle implementation of these regulations in-house." 154 F.R.D. at 684.

The facts of the present case have even less potential for giving rise to the duty alleged by the claimant. The scope of Kutak Rock's services was stated in its engagement letter to R & K, which hired Kutak Rock and served as KPERS's investment advisor. As we have already seen, the letter specifically stated what services would be performed. The bulk of the services is documenting the transaction, and Kutak Rock stated its understanding that it may be asked for legal advice "in structuring the transaction." KPERS's claim that Kutak Rock had a duty to render advice regarding the financial wisdom of the investment rests on Kutak Rock's agreement to "perform such due diligence inquiries and activities as may be required by the investors." KPERS, however, does not contend that it specified what it required in the way of due diligence inquiries and activities. Nor does KPERS contend that it specified that the results of due diligence inquiries and activities should be reported directly to KPERS rather than to the investment advisors. Without these directions, according to the reasoning of the RTC case, Kutak Rock did not have the alleged duties to undertake an independent financial analysis and to communicate the results of the independent financial analysis to the client.

The case of *Lamb v. Barbour*, 188 N.J. Super 6, which is cited by the district court, is in accord with the federal court's view that an attorney's duty to his or her client corresponds to the undertaking. In *Lamb*, when businesses collapsed shortly after acquisition, clients sued the attorney who represented them in connection with the purchase. The trial judge concluded that the attorney should have told his clients "of his doubts concerning the sufficiency of their judgment, skill and experience to operate businesses which involved annual gross revenues of over a million dollars and approximately 100 employees," that the sellers' claims of unreported income might be false, that the sellers' failure to report income could result in liability for back taxes and penalties, and should have recommended to his clients that they obtain a current financial statement, have an accountant examine the books, and inspect

the sellers' equipment. 188 N.J. Super at 10-11. The appellate court disagreed, stating: "The extent of a lawyer's liability to his client 'necessarily depends upon the nature of the undertaking.' [Citation omitted.]" N.J. Super at 14. The appellate court believed it would have been presumptuous for defendant to have cautioned against purchasing the businesses due to his clients' lack of business acumen. The court stated:

"Plaintiffs' reliance on defendant's background in tax law and accounting did not justify the expectation of counselling as to the prudence of the course they had chosen. This decision was properly left to the exercise of plaintiffs' business judgment. To hold defendant answerable for his failure to discourage the transaction we would have to speculate about his possible liability had he succeeded and the businesses were later operated successfully by another buyer." 188 N.J. Super at 14.

It could be said in the present case, too, that holding the law firm to a duty to advise its client of the financial wisdom of an investment could result in liability for a breach of duty should the investment prove sound. That is, given the duty of financial advising, if Kutak Rock had convinced KPERS that the Sharoff investment was imprudent and some other investor had benefited from it, we could be speculating about Kutak Rock's possible liability for KPERS's lost opportunity.

KPERS contends that the standard is higher in this case because it is a trust. KPERS sought to establish the standard through the testimony of expert witnesses. The existence of a duty being a matter of law for the court's determination, the legal conclusions of expert witnesses do not settle the analysis. None of the cases cited by KPERS supports its position in the circumstances of this case. Moreover, *Gillespie IV*, in which the Court of Appeals considered the duty of an accountant to a trust, states that "[a]n accountant has a duty to do that which he or she is hired to do." 19 Kan. App. 2d at 769. Like an accountant who has a duty to do that which he or she is hired to do, an attorney has a duty to do that which he or she is hired to do by a trust or non-trust client.

KPERS contends that even if Kutak Rock initially did not owe a duty to KPERS to determine whether the Sharoff investment was prudent, when Kutak Rock learned, as it inevitably did, that

the investment was imprudent, the law firm then had a duty to advise KPERS. The district court rejected this argument on the ground that Kutak Rock had no duty to engage in financial analysis, and, hence, the law firm had no duty to communicate information gleaned from financial analysis to KPERS. In addition, the district court found no evidence that Kutak Rock did not provide R & K with all of the information it had. The district court rejected KPERS's contention that any information should have been given to it rather than or in addition to R & K. Citing *Villanueva v. Brown*, 103 F.3d 1128 (3d Cir. 1997), and *Heine v. Newman Tannenbaum*, 856 F. Supp. 190 (S.D.N.Y. 1994), the district court concluded that an attorney can rely on a client's delegation to an agent.

Each of the federal cases involved a law firm's disbursing a client's money in reliance on the instructions of a person who held a power of attorney. In this case, Kutak Rock communicated perceived weaknesses in Sharoff's business structure and practices to R & K, which was employed by KPERS as the investment advisor. In the federal cases, the law firms' duty was not to disburse a client's money without authority of the client. The law firms acted on the belief that the client, through the person holding the power of attorney, had authorized disbursal. In the present case, the law firm's alleged duty was to communicate any misgivings about the Sharoff investment directly to KPERS. The alleged breach was communicating with R & K rather than directly with KPERS. Even though there is little common ground between the federal cases and the present one, the principle for which the district court cited the federal cases seems sound. The district court rejected KPERS's contention that Kutak Rock had a duty to give any information to it rather than or in addition to R & K on the ground that an attorney may rely on a client's delegation to an agent. In this case, KPERS employed the services of R & K for investment advice. In communicating with R & K about Sharoff's enterprise, Kutak Rock was communicating with the firm on which KPERS relied for investment advice. Thus, if a duty to advise devolved upon Kutak Rock as it gained information about Sharoff's business, as KPERS con-

tends, Kutak Rock discharged the duty by communicating with R & K, the investment professional.

It does not follow from the legislature's codifying the prudence standard for KPERS's investments that attorneys hired to document an investment transaction and to make due diligence inquiries about the business have a duty to determine the financial wisdom of the investment. The scope of the attorney's duty in the circumstances of this case is commensurate with his or her undertaking.

KPERS's theory of liability for a breach of trust is that R & K breached its fiduciary duty to KPERS by making the imprudent Sharoff investment. According to KPERS, because Kutak Rock knew facts that would lead a reasonably intelligent and diligent party to inquire whether R & K was committing a breach of trust by making the investment, it participated in the breach of trust.

The district court concluded that KPERS's allegations were insufficient to establish that Kutak Rock participated in a breach of trust. The district court looked to *Gillespie v. Seymour*, 14 Kan. App. 2d 563, 796 P.2d 1060 (1990) (*Gillespie I*), for the elements of participation in a breach of trust. Two elements are articulated in *Gillespie I*. The first element is knowledge of the breach or "the legal equivalent" of knowledge of the breach. The second element is "any act whatsoever" that furthers the breach. 14 Kan. App. 2d at 569-70. The district court also noted that in *Gillespie I* the Court of Appeals discussed the theory of participation in a breach of trust by quoting Bogert, Trusts and Trustees § 901 (2d ed. 1982):

" 'The wrong of participation in a breach of trust is divided into two elements: (1) an act or omission which furthers or completes the breach of trust by the trustee, and (2) knowledge at the time that the transaction amounted to a breach of trust, or the legal equivalent of such knowledge.

'Mere knowledge by a third person that a breach of trust is in process, coupled with a failure to notify the beneficiary or to interfere with the action of the trustee, does not amount to a participation in a breach. Such conduct is inaction which may be reprehensible under the highest standards of ethics, but no legal duty has been violated. On the other hand, if the third party by any act whatsoever assists the trustee in wrongfully transferring the benefits of the trust property to the trustee, another person, or the alleged participant, or aids in destroying or injuring

that property, there has been conduct upon which liability can be predicated, if the requisite state of mind existed in the defendant.

'In order that the third party be liable as a participant, it is not necessary to show that he benefited as a result of the transaction.' " 14 Kan. App. 2d at 569-70.

The district court accurately observed that in consequence of courts' applications of the elements of participation in a breach of trust to widely varying theories of liability, the analysis has become murky. The precise nature of an act giving rise to liability is the controversy. Although noting the "any-act-whatsoever" language from *Gillespie I*, the district court settled on the following principles—participation must be active and substantial and more than mere negligence.

The district court's analysis centered on the nature of the act required, and unless that analysis is faulty, we need not address the first element of the cause of action—knowledge of the breach or "the legal equivalent" of knowledge of the breach.

The question is whether Kutak Rock performed any act that furthered the breach. Based on its reading of Restatements and case law, the district court concluded that the participation must be active and substantial and more than mere negligence. The district court cited *Gillespie I* for each of the qualifications on the act and *Gillespie IV* with regard to the qualification of more than mere negligence. Measuring Kutak Rock's actions by this standard, the district court concluded that Kutak Rock was entitled to summary judgment on the participation in a breach of trust count. The district court stated:

"If this is the standard in Kansas, Kutak Rock cannot be liable. There is no evidence in the record that Kutak Rock: concealed information which might be necessary for KPERS to make its determinations as to the prudence of the investment; provided any false or misleading information; encouraged the investment; assisted Reimer and Koger with Reimer and Koger's due diligence [financial] investigation or in any other way acted to further the decision that Sharoff was a prudent investment.

"Even short of collusion, there is no evidence that Kutak Rock substantially assisted Reimer and Koger or in any way assisted Reimer Koger in making the due diligence [financial] investigation. Further, in this Memorandum Decision and Order the Court has found that Kutak Rock was not negligent, much less that

they were grossly negligent, acted willfully, wantonly, or intentionally, or in another way engaged in conduct with is 'more tha[n] mere negligence.'

"In summary, there is no evidence that Kutak colluded with Reimer and Koger; that they had any knowledge, actual or constructive, of any of these facts which underlie KPERS' theory that Reimer and Koger committed a breach of trust; nor that they were grossly or wantonly negligent or acted intentionally."

On appeal, KPERS cites a number of foreign cases for the proposition that the proof required of plaintiffs should not be more onerous for attorneys who represent clients who breach a trust than for other defendants. With regard to the standard expressed in Kansas cases, KPERS correctly points out that there is some variation in language from one Kansas case to another. KPERS states that this court has required substantial assistance in *York v. InTrust Bank, N.A.*, 265 Kan. 271, 962 P.2d 405 (1998), and *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 811 P.2d 1220 (1991).

According to KPERS, Kutak Rock's conduct tops even the substantial assistance test. KPERS would have the court agree with its contention by measuring Kutak Rock's actions against a six-factor test set out in *Ridenhour*. The *Ridenhour* test was not intended to measure whether assistance was substantial, and, indeed, one of its factors is the amount of assistance rendered. The *Ridenhour* test was formulated to detect aiding and abetting violations of a securities statute. The six parts consist of five parts Restatement (Second) of Torts § 876 (1977) and one part federal securities law. There is no good reason for the court to use the *Ridenhour* test to assess whether assistance in a breach of trust is substantial.

Regarding the matter of substantial assistance, the district court noted that the Court of Appeals in *Gillespie I* quoted Bogert, Trusts and Trustees § 901, which states: "[I]f the third party by any act whatsoever assists the trustee in wrongfully transferring the benefits of trust property to the trustee . . . there has been conduct upon which liability can be predicated, if the requisite state of mind existed in the defendant." 14 Kan. App. 2d at 570. The district court also noted that the Court of Appeals in *Gillespie IV* seemed to suggest that a professional's liability can only be predicated on collusion. Here is the Court of Appeals' language that led to the district court's observation:

"The [district] court also found Burdge [the accountant] was not hired to give investment advice. The fact the investments were imprudent did not mean he was responsible for them. He was hired to prepare the taxes—that he did. If he conspired with Seymour, Jr. to hide the extent of the imprudence, Burdge committed a tort." 19 Kan. App. 2d at 769.

Substantialness, which seems to require formulation of a test of its own on account of the lack of definition in the term, is not a good measure of the conduct at issue here. A better measure of an act that would satisfy the action element of participation in a breach of trust is the measure of the duty undertaken by defendant, just as for breaches of express and implied duty. Precedent for the standard is found in *Gillespie IV*, where the Court of Appeals reversed the district court's decision against the accountant on conspiracy and breach of trust theories. The Court of Appeals stated:

"An accountant has a duty to do that which he or she is hired to do. One court has gone so far as to say an accountant has no *legal* duty to inform trust beneficiaries that a trustee is committing a breach of trust. *Painters of Phil. D. Coun. v. Price Waterhouse*, 879 F.2d 1146, 1153 n. 9 (3d Cir. 1989). In *Gillespie*, this court appeared reluctant to extend an accountant's responsibility when it accepted the reasoning of *In re Gas Reclamation, Inc. Securities Litigation*, 659 F. Supp. 493 (S.D.N.Y. 1987) and *Latigo Ventures v. Laventhol & Horwath*, 876 F.2d 1322 (7th Cir. 1989). In each of those cases, the deciding court held the accountants' duties could not be expanded beyond the duties owed the client.

"Ultimately, the block investment scheme achieved its purpose—tax avoidance. The costs of the savings probably outweighed the benefits. Absent any indication Burdge was responsible for the decision to make the investment, there was no breach of a legal duty." 19 Kan. App. 2d at 769-70.

Here, the defendant is a law firm rather than an accountant, and the purpose of the investment was not to avoid taxes. In other respects, the circumstances are similar. Likewise, absent evidence that Kutak Rock was responsible for the decision to make the investment, there was no breach of a legal duty.

In summary, KPERS sought investment advice from R & K with the aim of satisfying the prudent investment requirement of K.S.A. 74-4921(4) (Ensley 1985). The duty delegated by KPERS to R & K was to secure prudent investments. R & K did not delegate that duty to Kutak Rock. R & K hired Kutak Rock to conduct due diligence inquiries into Sharoff's business organization and opera-

tions. No authority has been cited which would require Kutak Rock, which had been hired by KPERS's agent to perform particular duties in furtherance of the overall investment transaction, to develop its understanding of the transaction beyond its own undertaking. The scope of the attorney-client relationship between Kutak Rock and R & K was set out in the engagement letter. KPERS's trustees establish investment policies, and R & K was the investment manager for KPERS and authorized to make investments. There is no evidence that Kutak Rock agreed to or assumed any duty other than set out in the engagement letter. Kutak Rock's duty as counsel for R & K did not include the duty to determine if the Sharoff investment was prudent. Nor did Kutak Rock perform any act that furthered a breach of trust by R & K.

Affirmed.

DAVIS, J., not participating.

BRAZIL, S.J., assigned.